UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

JUSTIN SULLIVAN,

                             Plaintiff,

             v.

AIRCRAFT SERVICES GROUP, INC. and
KERRY SAILLER,

                            Defendants.

**MEMORANDUM & ORDER**
19-CV-6500 (MKB)

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiff Justin Sullivan commenced the above-captioned action on November 18, 2019

against Defendants Aircraft Services Group, Inc. ("ASG") and Kerry Sailler, (Compl., Docket

Entry No. 1), and on March 31, 2020, filed an Amended Complaint alleging libel *per se*,

intentional interference with contract, and interference with prospective business relations

against Defendants,[1] and unfair and deceptive business practices in violation of New York

General Business Law § 349 ("GBL § 349") against ASG,[2] (Am. Compl., Docket Entry No. 27).

---

[1] On July 13, 2020, Sailler moved to dismiss Plaintiff's claims for intentional interference with contract and interference with prospective business relations pursuant to Federal Rule of Civil Procedure 12(b)(6), and ASG joined the motion. (Defs.' Mot. to Dismiss Intentional Interference with Contract and Interference with Prospective Business Relations, Docket Entry No. 33; ASG Letter dated June 23, 2020, Docket Entry No. 31.) By Memorandum and Order dated March 8, 2021, the Court granted Defendants' July 13, 2020 motion and dismissed Plaintiff's claims for intentional interference with contract and interference with prospective business relations. *See Sullivan v. Aircraft Servs Grp., Inc.*, No. 19-CV-6500, 2021 WL 11703008, at *1 (E.D.N.Y. Mar. 8, 2021).

[2] On December 2, 2020, ASG requested a premotion conference in anticipation of a motion to dismiss Plaintiff's GBL § 349 claim, (ASG Letter for Premotion Conf. dated Dec. 2, 2020 ("ASG PMC Letter"), Docket Entry No. 39), and Plaintiff opposed the motion, (Pl.'s Opp'n Letter to ASG PMC Letter dated Dec. 10, 2020, Docket Entry No. 40). By Memorandum

Sailler now moves for summary judgment on Plaintiff's libel *per se* claim and seeks to preclude Plaintiff from seeking special damages and to limit his recovery to nominal damages.[3] ASG moves for summary judgment on Plaintiff's libel *per se* and GBL § 349 claims and seeks to bar Plaintiff from seeking special damages.[4]  Plaintiff opposes both motions.[5]  For the reasons explained below, the Court grants in part and denies in part Defendants' motions.

---

and Order dated January 8, 2021, the Court denied ASG's request as procedurally barred because ASG could have moved to dismiss the GBL § 349 claim when it joined Sailler's motion to dismiss or filed a separate motion. *Sullivan v. Aircraft Servs. Grp., Inc.*, No. 19-CV-6500, 2021 WL 76836, at *2 (E.D.N.Y. Jan. 8, 2021).

[3]  (Def. Sailler's Mot. for Summ. J. ("Sailler's Mot."), Docket Entry No. 74; Declaration of Thomas M. Mealiffe, Esq. in Supp. of Sailler's Mot. ("Mealiffe Decl."), Docket Entry No. 74-1; Videoconference Deposition of Justin Sullivan ("Sullivan Tr."), annexed as Ex. A to Mealiffe Decl., Docket Entry No. 74-2; Deposition of Alan R. Cook ("Cook Tr."), annexed as Ex. C to Mealiffe Decl., Docket Entry No. 74-4; Deposition of Kerry Sailler ("Sailler Tr."), annexed as Ex. D to Mealiffe Decl., Docket Entry No. 74-5; Sullivan Tr. Exhibit 10 ("Sullivan Ex. 10"), annexed as Ex. F to Mealiffe Decl., Docket Entry No. 74-7; Sullivan Tr. Exhibit 19 ("Sullivan Ex. 19"), annexed as Ex. G to Mealiffe Decl., Docket Entry No. 74-8; Sullivan Tr. Exhibit 20 ("Sullivan Ex. 20"), annexed as Ex. H to Mealiffe Decl., Docket Entry No. 74-9; Sullivan Tr. Exhibit 56 ("Sullivan Ex. 56"), annexed as Ex. I to Mealiffe Decl., Docket Entry No. 74-10; Sullivan Tr. Exhibit 17 ("Sullivan Ex. 17"), annexed as Ex. J to Mealiffe Decl., Docket Entry No. 74-11; Emails between G. Buscetto and J. Sullivan with Draft Management Agreement ("Sailler Mot. Ex. M."), annexed as Ex. M to Mealiffe Decl., Docket Entry No. 74-14; Email Thread Between Kerry Sailler and Ian Greenberg ("Greenberg Email"), annexed as Ex. N to Mealiffe Decl., Docket Entry No. 74-15; Def. Sailler's Mem. in Support of Sailler's Mot. ("Sailler's Mem."), Docket Entry No. 74-16; Def. Sailler's Reply in Further Supp. of Sailler's Mot. ("Sailler's Reply"), Docket Entry No. 81.)

[4]  (Def. ASG's Mot. for Summ. J. ("ASG's Mot."), Docket Entry No. 76; Def. ASG's Mem. in Supp. of ASG's Mot. ("ASG's Mem."), Docket Entry No. 76-1; Decl. of Marissa Koblitz Kingman, Esq. in Supp. of ASG's Mot. ("Kingman Decl."), Docket Entry No. 76-3; October 4, 2019 Email of Kerry Sailler, annexed as Ex. B to Kingman Decl., Docket Entry No. 76-3; Def. ASG's Reply in Further Supp. of ASG's Mot. ("ASG's Reply"), Docket Entry No. 77.)

[5]  (Pl.'s Opp'n to Sailler's and ASG's  Mots. ("Pl.'s Opp'n"), Docket Entry No. 79; Pl.'s Affidavit in Opp'n to Defs.' Mots. ("Pl.'s Aff."), Docket Entry No. 79-3; Decl. of Seth Salinger, Esq. ("Salinger Decl."), Docket Entry No. 80; Def. Sailler's Responses & Objections to Pl.'s First Request for Admissions ("Sailler's R&O"), annexed as Ex. A to Salinger Decl., Docket Entry No. 80.)

## I.    Background

### a.    Factual background

The following facts are undisputed unless otherwise noted.[6]

Plaintiff is a private airplane charter executive and broker who has been in the private aviation industry since 2005.  (Pl.'s ASG 56.1 Resp. ¶ 4; Pl.'s Sailler 56.1 Resp. ¶¶ 4–5.)  He has conducted management and brokering business through several entities, including: Metropolitan Aviation ("Metro") doing business as NextFlight Aviation ("NextFlight"); Private FLITE Worldwide LLC ("Private FLITE Worldwide LLC"); UbAir LLC ("UbAir"); Justin Sullivan doing business as Private FLITE ("Private FLITE"); FLITE Partners LLC ("FLITE Partners"); Justin Sullivan doing business as AJAX Jets ("AJAX"); and Chicago Jet Group.  (Pl.'s Sailler 56.1 Resp. ¶¶ 5–6.)

ASG is an air carrier that the Federal Aviation Administration (FAA) has certified to operate charter flights.  (*See* Pl.'s ASG 56.1 Resp. ¶ 2.)  Sailler is ASG's Director of Charter Sales and in this role "oversees [ASG's] sales department, interacts with clients and aircraft owners, and provides on-demand private aviation services."  (Pl.'s Sailler 56.1 Resp. ¶ 2; Pl.'s ASG 56.1 Resp. ¶ 3.)  She has worked for ASG since 2014 and been in the aviation industry since 2004.  (Pl.'s Sailler 56.1 Resp. ¶ 3.)

In the private charter aviation industry, managers "represent the interests of [a private] aircraft's owner and contract with operators to lease the aircraft for charter flights."  (Pl.'s Sailler 56.1 Resp. ¶ 7.)  Operators are air carriers that the FAA certifies to operate charter flights and

---

[6]  (Def. Sailler's 56.1 Stmt. ("Sailler's 56.1"), Docket Entry No. 74-17; Def. ASG's 56.1 Stmt. ("ASG's 56.1"), Docket Entry No. 76-2; Pl.'s Resp. to ASG's 56.1 ("Pl.'s ASG 56.1 Resp."), Docket Entry No. 79-1; Pl.'s Resp. to Sailler's 56.1 ("Pl.'s Sailler 56.1 Resp."), Docket Entry No. 79-2.)

maintain operational control over the leased aircraft. (*Id.* ¶ 8.) Brokers facilitate transactions, such as booking charter flights, between an individual or business customer and an airplane operator, although in some instances customers book directly from an operator. (*Id.* ¶ 9; Pl.'s ASG 56.1 Resp. ¶ 12.) During the relevant time period, Plaintiff was a broker for and manager of two to three aircrafts. (Pl.'s Sailler 56.1 Resp. ¶ 4.) In January of 2019, he entered into aircraft management contracts with the owners of two aircrafts: (1) LBC Aviation ("LBC") for aircraft N805DW and (2) Falcon 50-054 LLC ("Falcon 50") for aircraft N954SG. (Sullivan Tr. 32:12–33:1; Pl.'s Sailler 56.1 Resp. ¶ 10.) In October of 2019, Plaintiff entered into an aircraft management agreement with F50 Equipment Leasing ("F50") for a third aircraft, the N217PT. (Sullivan Tr. 33:16–34:22; Pl.'s Sailler 56.1 Resp. ¶ 10.)

### i.    Plaintiff's relationship with Metro/NextFlight

In early 2019, Plaintiff advised LBC and Falcon 50 to lease their planes to Metro. (Pl.'s Sailler 56.1 Resp. ¶ 11.) In April or May of 2019, Metro, owned by Alan Cook, assumed operational control of the LBC and Falcon 50 aircraft, and FAA granted Metro economic authority to charter the planes. (Sullivan Tr. 37:5–17, 42:16–18; Pl.'s Sailler 56.1 Resp. ¶ 11.) Metro is a single legal entity, but uses the name Metro when acting as an operator, and the name NextFlight when acting as a broker. (Pl.'s Sailler 56.1 Resp. ¶ 12.) Thus, while Metro had operational control and economic authority, NextFlight was used to broker the aircraft and facilitate booking charter flights. (*Id.* ¶ 12.) Plaintiff acted on behalf of and through NextFlight in handling all brokering business for the LBC and Falcon 50 aircraft, including client service, quoting, itineraries, and catering arrangements. (Sullivan Tr. 56:5–12; Pl.'s Sailler 56.1 Resp. ¶ 13.) Plaintiff was neither an employee nor an officer of NextFlight, (*see* Sullivan Tr. 47:15–22, 55:22–56:12; Pl.'s Sailler 56.1 Resp. ¶ 14; Pl.'s Aff. ¶ 9), but used a NextFlight email address and sent itineraries to customers on behalf of NextFlight, (Pl.'s Sailler 56.1 Resp. ¶ 14). Plaintiff

4

was aware that NextFlight identified him as "Director of Sales" on promotional materials and sent materials marked "from the desk of Justin Sullivan," (Sullivan Tr. 48:13–51:5; Pl.'s Sailler 56.1 Resp. ¶ 14), but he did not object or seek to correct these representations, (Pl.'s Sailler 56.1 Resp. ¶¶ 15–16). In June of 2019, Plaintiff learned of financial issues at Metro including underreporting of income and overreporting of expenses. (*Id.* ¶ 19.)

### ii.   Refund dispute with StarFlight Aviation

On or before July 10, 2019, StarFlight Aviation ("StarFlight") booked and prepaid through Plaintiff and NextFlight a multi-leg charter flight on Falcon 50's aircraft from Minneapolis to New York City, Boston, and Los Angeles with a return trip to Minneapolis. (*Id.* ¶ 20; Sullivan Ex. 10 at 12.) StarFlight, on behalf of a client, signed a contract with NextFlight for the chartered flight that included a "100 percent cancellation policy."[7] (Sullivan Ex. 10 at 9; Sullivan Tr. 150:2–13, 171:3–19.) Metro operated the chartered flight under its lease agreement with Falcon 50. (Pl.'s Sailler 56.1 Resp. ¶ 12; *see* Pl.'s Aff. 8–12.) The charter flight commenced on July 10, 2019 but, after arriving in Boston, StarFlight cancelled the Boston to Los Angeles leg of the trip and returned directly to Minneapolis. (Pl.'s Sailler 56.1 Resp. ¶ 20.) Kelly Moisey, Vice President and broker at StarFlight, sought a refund on StarFlight's client's behalf for the untraveled leg of the trip, taking the position that StarFlight had revised rather than cancelled its trip and issuing a refund to StarFlight for the Boston to Los Angeles leg that StarFlight's client had not flown was standard industry practice. (Sullivan Ex. 10 at 9–10; Sullivan Tr. 150:14–19; Cook Tr. 40:13–43:5.) Plaintiff testified that he refused to issue a refund because he believed StarFlight was not entitled to one under the cancellation policy in StarFlight's contract with NextFlight. (Sullivan Tr. 171:3–19; Sullivan Ex. 10 at 9; Cook Tr.

---

[7] Plaintiff has not defined the terms of the "100% cancellation policy," nor has he provided a copy of the contract clause to the Court.

40:13–43:5; *see* Pl.'s Sailler 56.1 Resp. ¶ 20.)  Because Metro was the operator of the chartered

flight, Moisey also sought a refund from Cook, Metro's CEO.  (Pl.'s Sailler 56.1 Resp. ¶¶ 12,

22.)  Cook believed that a refund or at least a 50 percent credit was due to StarFlight, but he had

no control over refunding the money because Plaintiff as the flight's broker accepted and

controlled the funds for the owner.  (Pl.'s Sailler 56.1 Resp. ¶ 22; Sullivan Tr. 150:20–22, 154:8–

15; Cook Tr. 45:16–46:9.)

Following the StarFlight refund dispute, Plaintiff's business relationship with Cook

deteriorated and their business relationship ended on or before August 12, 2019.  (Pl.'s Sailler

56.1 Resp. ¶¶ 23–24; Sullivan Ex. 10 at 2.)  Moisey continued to pursue obtaining a refund from

Plaintiff and Cook through at least August 12, 2019, when Cook informed Moisey that he had

"ceased working with" Plaintiff.  (Sullivan Ex. 10 at 2; Pl.'s Aff. ¶ 12; Sullivan Tr. 150:20–22;

Cook Tr. 45:16–46:9.)  On or about August 15, 2019, based on Plaintiff's advice, LBC and

Falcon 50 terminated their lease agreements with Metro, which rescinded Metro's authority to

operate their aircraft.  (Pl.'s Sailler 56.1 Resp. ¶ 25; Pl.'s Aff. ¶ 14; *see* Pl.'s Sailler 56.1 Resp. ¶

11–12.)  Plaintiff had advised LBC and Falcon 50 to terminate their agreements with Metro

because he did not "like doing business with" and "just [did not] like" Cook as Plaintiff believed

that Cook "proved to be dishonest and unreliable," "inflated costs in the owner's statements and

underrepresented revenues," and "had issues in making timely payments to employees and

vendors."  (Sullivan Tr. 42:10–43:5; Pl.'s Sailler 56.1 Resp. ¶ 23.)  In late September of 2019,

V2 Jets informed Plaintiff of an incident that occurred after he ended his affiliation with

Metro/NextFlight in which V2 Jets booked a flight, NextFlight did not complete the flight, and

V2 Jets had difficulty obtaining a refund, although it ultimately did receive one.  (Sullivan Tr.

63:25–65:16, 111:9–24, 169:6–170:4; Pl.'s Sailler 56.1 Resp. ¶ 48.)

6

### iii.  Plaintiff's initial negotiations with My Jet Saver for the Falcon 50, LBC, and F50 aircraft

Before LBC and Falcon 50 ended their lease agreements with Metro, Plaintiff, through one of his companies, FLITE Partners, had begun negotiating with My Jet Saver ("MJS") to replace Metro as the operator of LBC's and Falcon 50's aircraft.  (Sullivan Tr. 67:6–69:3; Pl.'s Sailler 56.1 Resp. ¶¶ 12, 26, 53.)  On August 14, 2019, Plaintiff emailed MJS's owner, Alejandro Marin, terms for FLITE Partners to partner with MJS to operate the LBC and Falcon 50 aircraft ("August 2019 Terms" or "Terms").  (Sullivan Tr. 68:4–24, 69:8–9, 77:7–13; Sullivan Ex. 19; Pl.'s Sailler 56.1 Resp. ¶ 28.)  Although the email states that the Terms were for "Falcon 50's Part 135," Plaintiff testified that the Terms applied to both the LBC and Falcon aircraft and that he and Marin had agreed to them in conversations that occurred before he sent the email.  (Sullivan Ex. 19 at 2; Sullivan Tr. 68:4–69:14, 71:14–18.)  The Terms were that FLITE Partners would be the "[a]gent for the owners" of the aircraft, would "book charters . . . [at an] average 50 hours / month," would earn "a share of the monthly [Profit & Loss] for the aircraft," and pay MJS an $8,000 monthly management fee per aircraft for MJS to provide such services as maintenance administration and pilot employment administration.  (Sullivan Ex. 19 at 2.)  The Terms also covered maintenance, and provided that the aircraft would be "under the MJS maintenance program," and "[s]erviced at service centers on the road" and that FLITE Partners would be "involved in and consulted on all but the minor [maintenance] decisions," "pay[] all parts and [maintenance] invoices directly, could "source parts with agreement from the [director of maintenance]," and "get bids for [maintenance] jobs from approved repair stations."  (*Id.*)  Plaintiff testified that based on the Terms, he expected FLITE Partners would earn "about $15,000 per month per plane."  (Sullivan Tr. 85:24–86:25.)  On August 22, 2019, Nelson Lopez, MJS's Chief Financial Officer, sent Plaintiff draft lease agreements for LBC and Falcon 50 to lease their aircraft to MJS.  (Sullivan Tr. 68:4–24, 69:8–9;

Pl.'s Sailler 56.1 Resp. ¶ 28; Sullivan Ex. 20.)

On or before October 2, 2019, Plaintiff engaged in separate negotiations with counsels

for MJS and F50 for MJS to lease the F50 aircraft, and on October 2, 2019, he emailed Marin

and Lopez a revised lease agreement for MJS to lease F50's aircraft.  (Sullivan Tr. 76:14–77:24;

Sullivan Ex. 56; Pl.'s Sailler 56.1 Resp. ¶ 28.)

### iv.  The October 3, 2019 email from Sailler

On October 3, 2019, Sailler sent the following email from the email address

ksailler@jetasg.com (the "October 3, 2019 Email") to a distribution list of approximately one

hundred and fifty operators:

> **Subject:** **Operators Beware**
>
> Hi Guys,
> I have heard this story [three] times today so I thought best to share with the fellow Operators.
>
> Metropolitan Aviation – Marketing at [sic] NextFlight
> As I understand it, they book the trips, get the payment and cannot complete the flights for one reason or another and brokers are unable to get their money back. NextFlight tried to recover a flight using us however they were unable to execute the contract properly and we walked away from the trip.
> <u>Players</u>
> Ben Gottshall
> Alan Cook
> John Wood
> Justin Sullivan
>
> There is more to the story.
> Justin Sullivan of PrivateFlite/UbAir and now AJAX Jets had a Falcon 50 on Metropolitans Cert and recently moved it to FL based MyJetSaver Cert and I believe the same shenanigans may [be] continuing over there.
>
> I know many of you folks outsource so I wanted to give a heads up!
>
> If any one has any Operator/Broker horror stories to share I encourage it to save us all the headache.
>
> Thanks and have a great day!

Sincerely,
Kerry Sailler
Director of Charter Sales
Aircraft Services Group

(Email dated Oct. 3, 2019, annexed to Am. Compl. as Ex. A, Docket Entry No. 27; Pl.'s ASG 56.1 Resp. ¶ 11; Pl.'s Sailler 56.1 Resp. ¶¶ 39, 40; Sailler's R&O No. 2; Kingman Decl. Ex. B.)

Sailler testified that she sent the email to "inform the operator sector of the industry that if they choose to do business with the aforementioned companies, just to beware." (Pl.'s Sailler 56.1 Resp. ¶ 43 (quoting Sailler Tr. 71:10–18).) She also testified that she has "a positive reputation in the industry of being an ambassador and trying to help people when they've got into these kind of situations with people doing poor business practice" and accordingly "share[s] both positive and negative interactions with companies among the operators, as do many other operators." (*Id.* (quoting Sailler Tr. 72:8–14).) She added that "it's not uncommon for [her] or anyone else to share their business dealings in this fashion." (*Id.* (quoting Sailler Tr. 72:17–18).) Sailler also testified that "[o]perators have an alliance in the aviation industry," (Sailler Tr. 65:2–8), and "work together for the greater good of the industry, strengthen[] the industry as a whole . . . and . . . work[] together to satisfy the needs of other operators, brokers, and retail clients," (*id.* at 65:2–8). (Pl.'s Sailler 56.1 Resp. ¶ 33.)[8] Sailler learned from Apollo Jets,

---

[8] Plaintiff failed to respond to paragraph thirty-three in Sailler's Rule 56.1 Statement, and the Court therefore deems the paragraph admitted. "A party opposing summary judgment must respond with a statement of facts as to which a triable issue remains. The facts set forth in a moving party's statement 'will be deemed to be admitted unless controverted' by the opposing party's statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 72 (2d Cir. 2001) (internal citation omitted) (quoting Local Civ. R. 56.1(c)), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Aptive Env't, LLC v. Vill. of E. Rockaway*, No. 21-677, 2022 WL 211091, at *2 (2d Cir. Jan. 25, 2022) ("So long as the moving party's Rule 56.1(a) statement includes citations to admissible evidence, '[i]f the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.'" (alteration in original) (quoting *Giannullo v. City of New York*, 322 F.3d 139, 140

Priority, Priority One, V2 Jets, and StarFlight that Metro was having difficulty fulfilling trips when the companies contacted her and ASG to recover the flights that Metro was unable to fulfill.  (Sailler Tr. 41:18–42:4; Pl.'s Sailler 56.1 Resp. ¶ 35.)  Metro also contacted Sailler directly to recover the unfulfilled flights.  (Sailler Tr. 41:18–42:4; Pl.'s Sailler 56.1 Resp. ¶ 35.)  Sailler believed Plaintiff played a part in Metro's inability to fulfill the flights because the flights were confirmed on the aircraft that he was involved with at NextFlight, and Ron Goldstein, a broker at Apollo Jets, and Ian Greenberg, a private aviation broker at Priority Jets, named Plaintiff when contacting her about the unfulfilled flights.  (Pl.'s Sailler 56.1 Resp. ¶ 36; Sailler Tr. 43:1–44:14.)  On October 3, 2019, Sailler received an email from Ian Greenberg at V2 Jets forwarding an email Plaintiff had sent to him.  (Pl.'s Sailler 56.1 Resp. ¶ 37; Greenberg Email.)  Plaintiff sent the email from his AJAX email account but referenced a charter option for an aircraft that Sailler indicated to Mr. Greenberg was chartered through MJS.  (Pl.'s Sailler 56.1 Resp. ¶ 37.)  Sailler testified that Plaintiff's use of two companies in this way was "considered double brokering" and was "frowned upon in the aviation industry."  (Sailler Tr. 46:14–47:13; Pl.'s Sailler 56.1 Resp. ¶ 37.)

On October 4, 2019, Plaintiff learned from Marin and Lopez that a recipient of the October 3, 2019 Email forwarded the message to at least five hundred brokers.  (Pl.'s Sailler 56.1 Resp. ¶ 42; Pl.'s ASG 56.1 Resp. ¶ 11.)  Plaintiff did not know the basis of their knowledge, never saw any copies showing that the email was forwarded to the brokers, and did not have any knowledge of ASG or Sailler directly sending the email to brokers or anyone else other than the list of operators on the original email.  (Pl.'s Sailler 56.1 Resp. ¶¶ 41–42.)  Sailler never saw

---

(2d Cir. 2003))).  Nevertheless, the Court construes all evidence in favor of Plaintiff, as the nonmovant.  *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022).

proof that the email was forwarded to brokers.  (Pl.'s Sailler 56.1 Resp. ¶¶ 40–41.)  The email was never sent to or received by consumers of the aviation services that the operators and charter brokers provide.  (Pl.'s ASG 56.1 Resp. ¶ 13.)

Also on October 4, 2019, Plaintiff emailed Sailler a screenshot of the October 3, 2019 Email and stated that "[he] would like to call [her], to explain the facts and especially as they pertain to [him], [his] involvement and specifically when [he] took [his] planes off of [Metro's] certificate back in August."  (Sullivan Tr. Ex. 17; Sullivan Tr. 114:17–116:15; Sailler Tr. 91:18–22.)  He indicated that he "get[s] it, that [she] want[s] to protect the industry from that pain and warn good people about bad actors" and concluded his email by noting that Sailler has "earned a special place in this industry for [her] fair judgment, people listen to [her] because [she isn't] afraid to call bullshit" and that she "needs to hear [him] out."  (Sullivan Tr. Ex. 17; Sullivan Tr. 114:17–116:15; Sailler Tr. 91:18–22; Pl.'s Sailler 56.1 Resp. ¶ 45.)

### v.    October 5, 2019 call between Plaintiff and Sailler

On October 5, 2019, Plaintiff and Sailler spoke by phone and Plaintiff confronted her about the email ("October 5, 2019 Call").  (Pl.'s Aff. ¶¶ 33–34; Sailler Tr. 80:10–84:18, 92:23–93:3.)  During the call, Plaintiff asked Sailler to retract the October 3, 2019 Email, and Sailler responded that she would if Plaintiff "made sure to 'make it right' with" Moisey by returning the money for the untraveled leg of the chartered flight.  (*See* Sailler's R&O No. 15; Sailler's Tr. 80:20–81:4; Pl.'s Aff. ¶¶ 39–40.)  Sailler did not retract the email because Plaintiff did not refund the money for the flight, "despite the fact that the flight[] [Moisey's] clients paid for did not take place."  (Sailler's R&O No. 15; Sailler Tr. 80:20–81:4; Pl.'s Aff. ¶ 41.)

### vi.    Plaintiff's revised leasing and management arrangements for the LBC, Falcon 50, and F50 aircraft

On October 17, 2019, Plaintiff emailed Lopez revised draft lease agreements between

F50 and MJS and a revised management agreement between FLITE Partners and F50.  (Sullivan Tr. 76:14–77:24; Sullivan Ex. 56; *see also* Pl.'s Sailler 56.1 Resp. ¶ 28.)  Plaintiff contends that F50 leased its aircraft to MJS.  (Pl.'s Aff. ¶ 42.)  Plaintiff did not finalize lease or managements agreements with MJS regarding the LBC and Falcon 50 aircraft, and the two aircraft were never added to MJS's charter certificate.  (Pl.'s Sailler 56.1 Resp. ¶¶ 29–30; Sullivan Tr. 83:15–17.)

In November of 2019, Chicago Jet Group added the two aircraft to its operator's certificate, (Pl.'s Sailler 56.1 Resp. ¶¶ 29–30), and the arrangement was reflected in "written agreement of aircraft leases . . . between the aircraft owners [Falcon 50 and LBC] and Chicago Jet Group."  (Sullivan Tr. 83:19—84:7.)  Before agreeing to enter its lease agreement with Chicago Jet Group, LBC revised its management agreement with FLITE Partners to add that "[Plaintiff] shall not earn Fee until $100,000 in Startup Expenses has been  paid to [LBC]."  (Pl.'s Sailler 56.1 Resp. ¶ 55; Sailler Mot. Ex. M; Pl.'s Aff. 84.)  Plaintiff testified that he had a separate management agreement with Chicago Jet Group with terms that "were essentially the same as" the August 2019 Terms with MJS, except the management fee was $10,000 per month instead of $8,000 per month.  (Pl.'s Sailler 56.1 Resp. ¶¶ 31, 54; Sullivan Tr. 84:12–24.)  He also testified that the deal with Chicago Jet Group was "different" as the "nature of the relationship and the nature of the services provided by [MJS] were different, materially different from the services provided by Chicago Jet Group."  (Sullivan Tr. 84:12–17.)

## II.    Discussion

### a.    Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Capitol Recs., LLC v. Vimeo, Inc.*, 125 F.4th 409, 418 (2d Cir. 2025) (quoting Fed. R. Civ. P. 56(a)); *see Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court

must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55

F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358

(2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor

of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408

(2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)); *see also Qorrolli v.

Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) ("In determining whether there is a

genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences

against the moving party." (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126 (2d Cir.

2013))).  The role of the court "is not to resolve disputed questions of fact but only to determine

whether, as to any material issue, a genuine factual dispute exists."  *Kee v. City of New York*, 12

F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir.

2010)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could

reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986).  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary

judgment.  *Id.*  The court's function is to decide whether, "after resolving all ambiguities and

drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the

nonmovant."  *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr.

18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia*, 706 F.3d at 127, 129);

*see also Capitol Recs.*, 125 F.4th at 418 ("[A] genuine dispute as to a material fact precludes

summary judgment 'where the evidence is such that a reasonable jury could decide in the non-

movant's favor.'"  (quoting *Lucente v. County of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020))).

  **b. Plaintiff's libel *per se* claim**

   Defendants argue that they are entitled to summary judgment on Plaintiff's libel *per se*

claim because five individual statements in the October 3, 2019 Email are true or substantially

true.  In addition, Defendants argue that they are entitled to summary judgment because the statement "I believe the same shenanigans may [be] continuing over there" constitutes non-actionable opinion, (Sailler's Mem. 12–15; ASG Mem. 9–11), and the October 3, 2019 Email as a whole is protected under the common interest privilege, (Sailler's Mem. 15–18; ASG Mem. 12–14).[9]  Defendants also contend that Plaintiff cannot allege defamation per quod and defamation by implication for the first time in opposing their summary judgment motion, (ASG Reply 4–5), and that even if the Court were to recognize these theories, the claims would fail on the merits, (*id.* at 5–7).

Plaintiff argues that defamatory statements are to be construed as a whole, (Pl.'s Opp'n 1), and Defendants' "strained and artificial construction" of the October 3, 2019 Email into individual statements renders the statements "meaningless" or is otherwise misleading, (*id.* at 1–7).  Plaintiff also argues that the statement "I believe the same shenanigans may [be] continuing over there" is not an opinion and even if it were, it would be actionable.  (*Id.* at 8–11 (citations omitted).)  Plaintiff also contends that his Amended Complaint states a claim for "defamation per quod" or "defamation by implication."  (*Id.* at 7–8.)

The Court addresses whether the October 3, 2019 Email is substantially true, contains a statement of protected opinion, or is protected by the common interest privilege.  The Court also addresses Plaintiff's assertion of the defamation per quod and defamation by implication claims.

_____

[9]  In their respective motions, Defendants largely make the same or similar arguments. Sailler incorporated by reference all arguments made in ASG's briefing, and ASG incorporated all arguments made in Sailler's reply brief only.  (Sailler's Mem. 6 n.5; Sailler's Reply 8; ASG Reply 8).  The Court therefore attributes all arguments to both Defendants except those arguments unique to Sailler.

i.   **The Court cannot conclude as a matter of law that the October 3, 2019 Email is substantially true**

Defendants contend that Plaintiff admitted or otherwise conceded during his deposition that the following statements in the October 3, 2019 Email are true or substantially true: (1) "I have heard this story three times today, so I thought best to share with the fellow"; (2) "Metropolitan Aviation – Marketing at NextFlight"; (3) "As I understand it, they book the trips, get the payment, and cannot complete the flights for one reason or another, and brokers are unable to get their money back."; and (4) "There is more to this story.  Justin Sullivan of Private FLITE/UBAir and now AJAX Jets had a Falcon 50 on Metropolitan cert and recently moved it to FL based on My Jet Saver cert."  (Sailler's Mem. 7–8; ASG Mem. 5–6.)  Defendants contend that "Plaintiff cannot challenge, based on the record" that a fifth statement from the October 3, 2019 Email — "Players Ben Gottshall Alan Cook John Wood Justin Sullivan" — is substantially true because (1) Plaintiff admitted during his deposition that he was a player at NextFlight before August 15, 2019, the date Falcon 50 and LBC terminated their lease agreements with Metro, (Sailler's Mem. 11; ASG Mem. 7–8); (2) "there is no reason Sailler would have known about his resignation" from NextFlight, (ASG Mem. 8); and (3) Plaintiff testified to knowing that NextFlight was using his name in marketing materials and holding him out to the public as its director of sales, (Sailler's Mem. 10–11; ASG Mem. 7–9).  Sailler also argues that Plaintiff allowed NextFlight to use his name and "did not correct industry impression or notify the industry that he was no longer associated with NextFlight."  (Sailler's Mem. 11.)  In addition, Defendants argue that "[w]hether Plaintiff was or was not actually a 'Player' at NextFlight when the email was sent is a 'shaded distinction' that does not undermine the substantial truth of the statements at issue."  (ASG Mem. 8 (quoting *Cafferty v. Southern Tier Publishing Co.*, 226 N.Y. 87, 93 (1919)).  They contend that Plaintiff's "regret" over "his voluntary choice to knowingly

associate with [the] questionable people" listed in the email "because of favorable business terms" without investigation despite knowing of their "legal and financial issues" does not "convert an admitted truthful statement into actionable defamation." (Sailler's Reply 7.)

Plaintiff argues that Defendants' analysis of the email as individual statements is "not the law" because defamatory statements are to be construed as a whole. (Pl.'s Opp'n 1.) In addition, Plaintiff contends that Defendants' analysis of the statement "I have heard this story three times today, so I thought best to share with the fellow" is "essentially meaningless" because Sailler had "not yet introduced the subject or the content of the statement." (*Id.* at 2.) He argues the statement is also "innocuous" because "the number of times Sailler claims to have heard the 'story[]' is hardly dispositive of its truth or falsity" and Sailler "does not identify the sources from whom she heard the statement and in what context." (*Id.*) Plaintiff also argues that even if the Court were to evaluate the truth of the statement independently of other statements, the record is insufficient to determine its truth because Sailler did not identify in her deposition "the 'three times' she supposedly heard the allegations or the sources referred to in the introductory statement." (*Id.* at 2 n.1.) As to the statement "Metropolitan Aviation – Marketing at NextFlight," Plaintiff argues that Defendants' omission of the email subject line "**Operators Beware**" from their analysis of the statement obscures that "Operators Beware" is "intended to cause the intended audience to have a heightened sense of concern, alarm, or even fear" and the four asterisks framing "Operators Beware" give "Metropolitan Aviation" a "sinister connotation." (*Id.* at 2–3.) Plaintiff contends that Defendants' analysis of the statement "As I understand it, they book the trips, get the payment, and cannot complete the flights for one reason or another, and brokers are unable to get their money back" is "[d]ivorced from its predicate" and "when read in isolation . . . carries no weight." (*Id.* at 3.)

As to the statement that lists Plaintiff as a "Player" at NextFlight, Plaintiff argues that no party has defined the term "Player," and that isolating the single word is "highly misleading" as Defendants "attempt[] to make it appear as though [Plaintiff's] objection to the use of the word 'player' is an inconsequential 'quibble,'" and "divert[s] the Court's attention from taking the statement 'as a whole'" by making it appear that Plaintiff has "conceded that at one time[] he was a 'player'" and therefore "has conceded the truth of the statement." (*Id.* at 3–5.) He further argues that the October 3, 2019 Email "presents the events as though they are in the present and continuing," which renders "irrelevant that [he] concedes that at one time, he may have been a '[P]layer'" because "the complained-of activity was not occurring while he had any affiliation with [Metro]." (*Id.* at 3–4 n.2.) Plaintiff further argues that Defendants' focus on the word "Player" "assiduously avoids the remainder" of the October 3, 2019 Email and the "clear and unambiguous allegations" in the Amended Complaint "that speak to the portions of the [October 3, 2019] Email that [Defendants] *ignore*[] in [their] brief." (*Id.* at 5.) As an example, he notes that Defendants denied the allegation that "[n]o airplane owner, operator, broker, or anyone else involved in the private airplane charter industry has suffered any harm as a result of any illegal or unethical act or omission of [Plaintiff]" but have failed to demonstrate its falsity. (*Id.* at 5 & 5 n.3.) Plaintiff argues that Defendants focus on the word "shenanigans" in isolation from the first part of the paragraph that "There is more to this story. Justin Sullivan of Private FLITE/UBAir and now AJAX Jets had a Falcon 50 on Metropolitan cert and recently moved it to FL based on My Jet Saver cert" is misleading because in context "shenanigans" is not "quite as innocent as the Defendants would like it to seem." (*Id.* at 5–6 (internal quotation marks omitted).)

Plaintiff contends that "a reasonable juror" would understand from reading the October 2019 Email as a whole that "the author . . . intends her audience to understand, that [*Metro*] is unable to provide services to its customers, fails to refund their money, . . . that [*Plaintiff*] has

participated in such a scam together with others, including a convicted felon,"[10] and that "this nefarious activity" is "continuing" at My Jet Saver.  (*Id.* at 5–6.)  He contends that Sailler admitted that she does not "necessarily disagree" with this interpretation as she testified that she believed the same shenanigans may be continuing over at MJS "[b]ecause of [Plaintiff's] reputation."  (*Id.* at 6–7 (quoting Sailler Tr. 69:15).)  He also contends that "the effect" of the October 3, 2019 Email is that "it has improperly and falsely lumped [him] in with, not only [Metro] but also two of its disgraced staff: [Cook and Gottshall]."  (*Id.* at 5 (quoting Am. Compl. ¶ 38).)  He argues that the email is defamatory *per se* because it associated him with a convicted felon who was "well known in the industry in which both Sailler and [him] worked" and "whose crime was, in fact, stealing money"; "lump[ed] [his] name in with others at [Metro] which company had, in fact, cancelled flights and failed to refund monies *after* [Plaintiff] was no longer with it in any way"; and "was a deliberate attempt to link [him] with unfair and possibly criminal business practices (such as larceny by check)" by "suggesting that the 'same thing' may be happening at [MJS] where [Plaintiff] had recently relocated an aircraft."  (*Id.* at 15–16.)

"Defamation . . . is the invasion of the interest in a reputation and good name," *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (quoting *Hogan v. Herald Co.*, 446 N.Y.S.2d 836, 839 (App. Div. 1982), *aff'd*, 58 N.Y.2d 630 (1982)), and "consist[s] of the twin torts of libel and slander," *Farrakhan v. Anti-Defamation League*, No. 24-1237, 2025 WL 24066, at *2 n.1 (2d Cir. Jan. 3, 2025) (alterations in original) (quoting *Albert*, 239 F.3d at 265); *Ballentine v. Google LLC*, No. 24-CV-4699, 2024 WL 4855215, at *3 (S.D.N.Y. Nov. 21, 2024) ("Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name."

---

[10]  The October 3, 2019 Email lists Ben Gottshall along with Plaintiff, Cook, and John Wood.  Plaintiff asserts that Gottshall "pled guilty in 2014 in Pennsylvania to unlawful use of a computer, a third-degree felony."  (Pl.'s Aff. ¶ 29.)

(quoting *Albert*, 239 F.3d at 265)). "Generally, spoken defamatory words are slander; written defamatory words are libel." *Albert*, 239 F.3d at 265; *see Ballentine*, 2024 WL 4855215, at *3 (same); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) ("Defamation is the injury to one's reputation either by written expression, which is libel, or by oral expression, which is slander." (quoting *Idema v. Wagner*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000))); *see also Farrakhan*, 2025 WL 24066, at *2 n.1 ("To be precise, because plaintiffs challenge written statements, their claims are for libel." (citing *Albert*, 239 F.3d at 265)).

"Under New York law[,] a defamation plaintiff must establish five elements: (1) a . . . defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Carroll v. Trump*, 124 F.4th 140, 159 n.9 (2d Cir. 2024) (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)); *see also Cicel (Beijing) Sci. & Tech. Co. v. Misonix, Inc.*, No. 22-1834, 2024 WL 959619, at *4 (2d Cir. Mar. 6, 2024) (same); *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000). A defamatory statement is one that "tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [them] in the minds of right-thinking persons, and . . . deprive[s] [them] of their friendly intercourse in society." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 41 (App. Div. 2014)); *see also Biro*, 883 F. Supp. 2d at 456 ("A defamatory statement is one that exposes the plaintiff 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induces an evil opinion of one in the minds of right-thinking persons, and . . . deprives one of . . . confidence and friendly intercourse in society.'" (quoting *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 113 (2d Cir. 2005))). "A statement that tends to injure another in his or her trade, business or profession is defamatory *per se*." *Pantheon Props., Inc. v. Hous.*, No. 20-CV-3241,

2021 WL 4523619, at *3 (S.D.N.Y. Sept. 30, 2021) (quoting *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009)); *see Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001) ("A written statement that 'charges a person with the commission of a crime' or 'tends to disparage a person in the way of his office profession or trade' is libel *per se*." (citations omitted)).  To "injure another in his or her trade, business or profession," the statement must "be targeted at the specific standards of performance relevant to the plaintiff's business and must impute conduct that is 'of a kind incompatible with the proper conduct of the business, trade, profession or office itself.'"  *Staley v. Smart*, No. 23-CV-3546, 2024 WL 3835518, at *12 (S.D.N.Y. July 30, 2024) (quoting *Pure Power Boot Camp Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 550 (S.D.N.Y. 2011)), *report and recommendation adopted*, No. 23-CV-3546, 2024 WL 3835225 (S.D.N.Y. Aug. 14, 2024); *Conti v. Doe*, No. 17-CV-9268, 2019 WL 952281, at *7 (S.D.N.Y. Feb. 27, 2019) ("To be actionable as words that tend to injure another in his or her profession, the challenged statement must be more than a general reflection upon [the plaintiff's] character or qualities.  Rather, the statement must reflect on her performance or be incompatible with the proper conduct of her business."  (quoting *Golub v. Enquirer/Star Grp., Inc.*, 89 N.Y.2d 1074, 1076 (1997)).  The statement must "impute[ ] incompetence, incapacity or unfitness in the performance of one's profession," amounting "to an attack on plaintiff's professional ability" and constitute "more than a general reflection upon [plaintiff's] character or qualities."  *Staley*, 2024 WL 3835518, at *12 (alterations in original) (quoting *Clemente v. Impastato*, 711 N.Y.S.2d 71, 74 (App. Div. 2000)); *Radiation Oncology Servs. of Cent. N.Y., P.C. v. Our Lady of Lourdes Mem'l Hosp., Inc.*, 200 N.Y.S.3d 521, 530 (App. Div. 2023) (quoting same).

"A plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication."  *Celle*, 209 F.3d at 178.  "If the statement is susceptible of

only one meaning the court 'must determine, as a matter of law, whether that one meaning is defamatory.'" *Id.* (quoting *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985)); *see Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) ("[A] threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." (citing *James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 419 (1976)). "If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, 'it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood.'" *Celle*, 209 F.3d at 178 (quoting *Davis*, 754 F.2d at 83); *see Electra v. 59 Murray Enter., Inc.*, 987 F.3d 233, 259 (2d Cir. 2021) (quoting same).

"[C]ourts must give the disputed language a fair reading in the context of the *publication as a whole.*" *Cooper v. Franklin Templeton Invs.*, No. 22-2763, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023) (quoting *Celle*, 209 F.3d at 177). "Challenged statements are not to be read in isolation, but must be perused as the average reader would against the whole apparent scope and intent of the writing." *Id.* (quoting *Celle*, 209 F.3d at 177). "[C]ourts are not to 'strain' to interpret such writings 'in their mildest and most inoffensive sense to hold them nonlibelous.'" *Celle*, 209 F.3d at 177 (quoting *Nov. v. Time Inc.*, 13 N.Y.2d 175, 178 (1963)). "[T]he words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood *by the public to which they are addressed*." *Valley Elecs. AG v. Polis*, No. 21-2108, 2022 WL 893674, at *2 (2d Cir. Mar. 28, 2022) (quoting *Celle*, 209 F.3d at 177).

"[T]ruth is a complete defense to a defamation claim." *Cicel*, 2024 WL 959619, at *4 (alteration in original) (quoting *Birkenfeld v. UBS AG*, 100 N.Y.S.3d 23, 24 (App. Div. 2019)); *Cain v. Atelier Esthetique Inst. of Esthetics Inc.*, 733 F. App'x 8, 11 (2d Cir. 2018) ("[T]ruth provides a complete defense to defamation claims." (quoting *Dillon v. City of New York*, 704

N.Y.S.2d 1, 6 (App. Div. 1999))); *see also Crowley v. Billboard Mag.*, 576 F. Supp. 3d 132, 148

(S.D.N.Y. 2021) ("[S]tatements that are substantially true cannot be defamatory."); *Reus v. ETC*

*Hous. Corp.*, 164 N.Y.S.3d 692, 697 (App. Div. 2022) ("A defamation action is subject to an

absolute defense that the alleged defamatory statements are substantially true." (quoting *Proskin*

*v. Hearst Corp.*, 787 N.Y.S.2d 506, 507 (2005))).  "In New York, a statement need not be

completely true, but can be substantially true, as when the overall 'gist or substance of the

challenged statement' is true."  *Chau v. Lewis*, 771 F.3d 118, 130 (2d Cir. 2014) (emphasis

omitted) (quoting *Printers II, Inc. v. Pros. Publ'g, Inc*., 784 F.2d 141, 146 (2d Cir. 1986)); *see*

*Cain*, 733 Fed. App'x. at 11 (quoting same); *see also Olivet Univ. v. Newsweek Digit. LLC*, No.

24-1473, 2024 WL 5001841, at *3 (2d Cir. Dec. 6, 2024) ("'Substantial truth' is the standard by

which New York law . . . determines an allegedly defamatory statement to be true or false. . . .

[I]f an allegedly defamatory statement is 'substantially true,' a claim of libel is legally

insufficient and should be dismissed."  (second and third alterations in original) (quoting

*Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017)); *Baiocco*

*v. AEP RSD Inv'rs, LLC*, No. 21-2475, 2022 WL 2902081, at *4 (2d Cir. July 22, 2022) ("A

statement is 'substantially true' and unactionable 'if the statement would not have a different

effect on the mind of the reader from that which the pleaded truth would have produced.'"

(quoting *Tannerite Sports*, 864 F.3d at 242)); *Esses v. Rosen*, No. 24-CV-3605, 2024 WL

4494086, at *3 (E.D.N.Y. Oct. 15, 2024) (quoting same); *White v. Barry*, 288 N.Y. 37, 39 (1942)

("To constitute a complete defense the justification was bound to be as broad as the actionable

significance of the words.  'A workable test is whether the libel as published would have a

different effect on the mind of the reader from that which the pleaded truth would have

produced.'"  (quoting *Fleckenstein v. Friedman*, 266 N.Y. 19, 23 (1934)); *Moorhouse v.*

*Standard, N.Y.*, 997 N.Y.S.2d 127, 135 (App. Div. 2014) ("Because the falsity of the statement is

an element of the defamation claim, the statement's truth or substantial truth is an absolute defense." (quoting *Stepanov*, 987 N.Y.S.2d at 42)).

When read as a whole, the "gist," *Chau*, 771 F.3d at 130, of the October 3, 2019 Email is that Plaintiff, with Metro and Ben Gottshall, Cook, and Justin Wood, (1) has been booking prepaid trips, failing to complete the flights, and not refunding brokers the cost of the unfulfilled flights, and (2) may be continuing to do so at MJS. The context and the subject of the email, "**Operators Beware**," and the concluding sentences "If anyone has any Operator/Broker horror stories to share I encourage it to save us all the headache" and "I know many of you folks outsource so I wanted to give a heads up!," (*see* Email dated Oct. 3, 2019), suggest that Plaintiff, with the others listed, is engaging in wrongful or improper conduct by not completing flights and refusing to issue refunds such that one hundred and fifty operators needed to be warned about doing business with him. Thus, the email, if false, would be libelous *per se* because the accusations of misconduct impute to Plaintiff dishonesty, untrustworthiness, and wrongful and possibly criminal conduct that is "of a kind incompatible with the proper conduct of [his] business, trade, profession or office itself." *Liberman v. Gelstein*, 80 N.Y.2d 429, 436 (1992). *See Celle*, 209 F.3d at 189 (statements concerning a media company's withdrawal of its sponsorship of the plaintiff's radio station were defamatory *per se* because the statements "clearly attack[] [the plaintiff's] trustworthiness as a businessperson" by implying that the sponsorship withdrawal was due to plaintiff shortchanging the media company of its allotted time slot and portraying plaintiff as a cheat by "suggesting that purchasers [of the station's radio frequency] could not receive the signal"); *Pierce v. Better Holdco, Inc.*, No. 22-CV-4748, 2023 WL 6386920, at *9 (S.D.N.Y. Sept. 29, 2023) (statements by the founder and chief executive office of plaintiff's former employer that she "had been 'cooking the books' and 'fudging the numbers' by stating an artificially low cost of [the former employer's] loan processing" was

defamatory *per se* because the statement "imputes some form of fraud or misconduct to [the plaintiff], thus effecting reputational injury to her as a professional" (citations omitted)); *Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 260 (S.D.N.Y. 2023) (statements that an individual defendant made on a live social media broadcast to plaintiffs' "advertisers and influencers" that the defendants were "scam artists" was defamatory *per se* because it "impute[d], to the TAPP plaintiffs, 'fraud, dishonesty, misconduct, or unfitness in conducting their profession'" (citation omitted)); *Gatz v. Otis Ford, Inc.*, 691 N.Y.S.2d 113, 114 (App. Div. 1999) (customer's signage and statements that a car dealership was "dishonest, committed fraud, and 'ripped off' the [customer] by installing used parts in his car" were defamatory *per se* because "they accused the [car dealership] of, and imputed to its business, fraud, dishonesty, misconduct, and unfitness" and "by failing to indicate that there was never any promise to install new parts, and by leaving the impression with listeners and readers that such a promise was made, the [customer] failed to demonstrate the defense of truth").

Defendants' argument that they are entitled to the absolute defense of truth because five individual statements read in isolation are true or substantially true is unavailing because any average reader would read and consider the statements together and in the context of the email as a whole. *See Cooper*, 2023 WL 3882977, at *3 ("Challenged statements . . . must be perused as the average reader would against the whole apparent scope and intent of the writing." (quoting *Celle*, 209 F.3d at 177)). Moreover, as Plaintiff argues, the statements the Defendants have parsed from the email are meaningless or misleading when analyzed independently. For example, Defendants argue that Plaintiff admitted that the statement "There is more to this story. Justin Sullivan of Private FLITE/UBAir and now AJAX Jets had a Falcon 50 on Metropolitan cert and recently moved it to FL based on My Jet Saver cert." is true. (ASG Mem. 6; Sailler Mem. 8–9.) Analyzing the statement by itself reduces it to the "mildest and most inoffensive

sense," *Celle*, 209 F.3d at 177, as the sentence is merely conveying that Plaintiff changed the operator for the Falcon 50 from Metro to MJS.  Plaintiff testifying that the sentence on its own is "accurate" is inconsequential because the statement is completely divorced from the rest of the email and, thus, loses the potentially libelous meaning that Plaintiff was at Metro and "may [be] continuing" at MJS to engage in the wrongful conduct of not completing flights and then refusing to issue refunds.  The New York Court of Appeals and the Second Circuit have admonished courts not to "'strain' to interpret such writings 'in their mildest and most inoffensive sense to hold them nonlibelous.'"  *Celle*, 209 F.3d at 177 (quoting *Nov.*, 13 N.Y.2d at 178); *see id.* at 187 ("If every paragraph had to be read separately and off by itself plaintiff would fare pretty well.  But such utterances are not so closely parsed by their readers . . . and their meaning depends not on isolated or detached statements but on the whole apparent scope and intent."  (quoting *Nov.*, 13 N.Y.2d at 178 (alteration in original))).

The Court addresses whether (1) there is any genuine dispute of material fact concerning the truth of October 3, 2019 Email and (2) the October 3, 2019 Email is libel *per se* on the basis that Plaintiff's name was listed with Cook and Benjamin Gottshall.

### 1. Whether Plaintiff's refusal to issue a refund to StarFlight was wrongful conduct is a genuine dispute of material fact

Plaintiff's refund dispute with StarFlight is the only instance in the record before the Court of Plaintiff not issuing a refund for an uncompleted trip while affiliated with Metro/NextFlight, and there is a genuine dispute as to whether Plaintiff's refusal to refund StarFlight was improper as the October 3, 2019 Email suggests.  Sailler testified that at or around the time of sending the October 3, 2019 Email she knew or learned from her contacts that (1) Metro had difficulty fulfilling booked trips and refunding trips, (Sailler Tr. 40:22–42:4); (2) flights that Metro could not fulfill were confirmed on aircraft that Plaintiff was "involved with,"

(*id.* at 43:1–44:14); (3) Apollo had "problems with [Metro] surrounding the aircraft that [Plaintiff] was involved with," (*id.* at 63:13–17); (4) Plaintiff was posing as AJAX Jets and marketing their aircraft on MJS's behalf, (*id.* at 46:3–47:21, 63:21–23); (5) neither Apollo nor Priority wanted to do business with Plaintiff at MJS, (*id.* at 63:17–64:2); and (6) Plaintiff had a "negative reputation to be hot headed and threatening," was "quick to . . . sue and renege on contracts," and "B2 believed that their negative situation with the plane being pulled for their obligation was surrounded by the aircraft that were managed by" Plaintiff, (*id.* at 117:9–12). Sailler's deposition testimony does not substantiate the accusations of misconduct in her email and Defendants have not pointed to any other evidence.

In addition, there is conflicting evidence regarding whether Plaintiff's refusal to issue the StarFlight refund was wrongful conduct. Plaintiff testified that StarFlight was not due the refund under the cancellation terms of its contract with NextFlight, (Sullivan Tr. 171:1–19), Sailler testified that the refund was common practice, (Sailler Tr. 66:11–23), and other evidence supports that Plaintiff told StarFlight that no refund was due because of the contract terms and StarFlight took the position that the refund was standard practice, (*see* Sullivan Ex. 10 at 10–11; Sullivan Tr. 150:14–19; Cook Tr. 40:13–43:5).[11] Moreover, Plaintiff contends that "neither [Metro], Starflight, Moisey, nor anyone else" initiated legal action against him over the refund dispute, (Pl.'s Aff. ¶ 13), a fact which could support the inference that Plaintiff's conduct was

---

[11] Although Sailler points to Cook's testimony as support that Plaintiff's refusal to issue the refund was against standard practice, (*see* Sailler's 56.1 ¶ 21 (citing Cook Tr. 41:1–17)), Cook only testified to believing that StarFlight "should get some sort of a refund," (*see* Cook Tr. 41:1–17). Cook did not testify to the refund being standard practice. Rather, he testified that he sided with StarFlight and believed a refund or credit should be issued to preserve the client relationship for future business. (*See* Cook Tr. 42:2–9 ("I've dealt with StarFlight for a long time. They do a lot of business. They will put a lot of flying on your airplane. I would suggest you guys go back and work something fair. Give her 50 percent of that leg back. Give her something to try to keep the relationship solid[.]".))

lawful.  A reasonable jury could find that Plaintiff's refusal to issue StarFlight a refund was not misconduct that necessitated warning other operators to "beware" of doing business with him and that, in the absence of any other instances of Plaintiff failing to fulfill trips and issue refunds with Metro/NextFlight, the substance of the October 3, 2019 Email was not true.  *See Wiggins v. Griffin*, 86 F.4th 987, 995 (2d Cir. 2023) ("[I]t is not the court's role on summary judgment to make '[a]ssessments of credibility and choices between conflicting versions of the events.'" (second alteration in original) (quoting *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015))); *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023) (Courts do "not weigh evidence or assess the credibility of witnesses at the summary judgment stage."  (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005))); *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 246 (2d Cir. 2020) (explaining that when a district court is faced with "the contradictory deposition testimony [or declaration] of a fact witness . . . the general rule remains that a district court may not discredit a witness's deposition testimony [or declaration] on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury"  (alterations in original) (quoting *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) (per curiam)); *e.g.*, *Hoyle v. Dimond*, No. 08-CV-347, 2013 WL 1152037, at *2, *6 (W.D.N.Y. Mar. 19, 2013) (concluding the plaintiff raised a genuine dispute of material fact as to the truth of his statement that the owners of a monastery had stolen his money because "[i]f the finder of fact were to credit plaintiff's contention that he and the [owners] had come to an agreement regarding the return of funds upon plaintiff's departure from [the monastery], then the [owners'] refusal to honor that agreement could be considered theft").

    The record also includes evidence from which a reasonable jury could find that Sailler's claims in the October 3, 2019 Email were not based on any actual instances of Plaintiff engaging in wrongful conduct.  Sailler's testimony suggests that her email may have been based on her own

"belief" of what was "possible" based on Plaintiff's "reputation" rather than discrete incidents. (Sailler Tr. 61:8–62:13; *see* Pl.'s Opp'n 19–20.)[12]  The October 3, 2019 Email does not include a timeline for when the purported incidents occurred, and it is undisputed that Plaintiff's relationship with Metro/NextFlight ended on or about August 15, 2019, (Pl.'s Sailler 56.1 Resp. ¶¶ 23, 25), and that after Plaintiff's relationship with Metro/NextFlight ended, there was at least one instance of a Metro/NextFlight customer experiencing difficulty obtaining a refund for an unfulfilled trip, (*id.* ¶ 48).  Further, when asked at her deposition whether Plaintiff's allegation that "[m]ore than a month subsequent to the termination referenced in the preceding paragraph, [Metro] apparently had difficulty fulfilling booked trips and refunding monies to clients" was a true statement, Sailler testified that she "know[s] that [Metro] had difficulty fulfilling the booked trips and refunding money" but could not "verify the timeline." (Sailler Tr. 40:17–41:08, 42:5–19.)

---

[12]  Sailler testified as follows:
Q. Yes. Let me rephrase it. When you -- when you drafted this e-mail, did you intend to send the message that Mr. Sullivan was involved in the process of taking client money and not refunding it after trips were canceled?
[…]
THE WITNESS: It was **my belief** that he was involved with Metropolitan and the poor business dealings, and he was moving along to My Jet Saver where it was my impression that maybe some of that poor business practice may continue.
BY MR. SALINGER:
Q. And what was -- what poor business practice specifically are you referring to?
A. Double brokering and, you know, taking bookings and not satisfying the -- completing the flights.
Q. So my question was are you -- were you alleging -- in the e-mail, were you -- were you intending to imply in the e-mail that Mr. Sullivan personally was engaged in that practice: Taking money and not refunding for canceled flights?
[…]
THE WITNESS: It was **my belief that it was possible** that he was involved in those business dealings and those business dealings may continue based off his, you know, reputation.
(Sailler Tr. 61:8–62:1 (emphasis added).)

2.   **Plaintiff's name being listed along with Cook and Gottshall in the October 3, 2019 Email is not libelous *per se***

Plaintiff's contention that the email "has improperly and falsely lumped [Plaintiff] in with, not only [Metro] but also two of its disgraced staff: [Cook and Gottshall]," (*see* Pl.'s Opp'n 5 (quoting Am. Compl. ¶ 38)), does not constitute libel *per se*.  Based on the text of the email and the record before the Court, it is substantially true in the context of the email as a whole that Plaintiff had an affiliation with Cook.  (*See* Email dated Oct. 3, 2019.)  It is undisputed that Plaintiff's business relationship with Cook ended by August 15, 2019, (Pl.'s Sailler 56.1 Resp. ¶ 25), and the Court is not convinced that the fact of Plaintiff's business relationship ending with Cook less than two months before the October 3, 2019 Email "would have produced" a "different effect on the mind of the reader."  *Baiocco*, 2022 WL 2902081, at *4 ("[A] statement is 'substantially true' and unactionable only 'if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" (quoting *Tannerite Sports*, 864 F.3d at 242)).  As to Gottshall, there is a genuine dispute of material fact as to whether Plaintiff had any affiliation with Gottshall such that the email could be substantially true in "lumping" Plaintiff with him.[13]

However, even if Plaintiff never had a professional affiliation with Cook and Gottshall,

---

[13]   The record supports that Gottshall was Metro's chief pilot but is unclear as to whether Gottshall was chief pilot through August of 2019 when Plaintiff was affiliated with Metro/NextFlight.  Plaintiff testified that as of August of 2019, Gottschall was not associated with Metro and he did not know him personally.  (Sullivan Tr. 59:22–60:4.)  Cook could not recall exactly when Metro employed Cook and only remembered that Gottshall worked for Metro twice, at some point in 2018 and then again until Metro closed in September of 2019.  (*See* Cook Tr. 65:14–21, 66:12–20, 69:3–7, 78:19–79:16.)  Cook was also uncertain whether Plaintiff and Gottshall overlapped at Metro.  (Cook Tr. 65:22–66:11, 81:18–82:1.)  Sailler testified that she was "not sure" whether Plaintiff was affiliated with Metro at the same time as Gottshall.  (Sailler Tr. 58:19–22.)  The Court notes that Cook testified that FAA records would document the exact timeframe that Gottshall was the chief pilot for Metro, (Cook Tr. 67:2–8, 81:2–20), but neither party has presented any records to establish the dates of Gottshall's employment.

29

he cannot prevail on a claim of libel *per se* on the basis that his name was improperly lumped together with theirs because the October 3, 2019 Email does not "charge[]" Plaintiff with the commission of Gottshall's purported crimes nor does listing Plaintiff's name alongside Gottshall's and Cook's tend to disparage or injure his business or reputation as a charter flight manager and broker. *Meloff*, 240 F.3d at 145 ("A written statement that 'charges a person with the commission of a crime' or 'tends to disparage a person in the way of his office profession or trade' is libel *per se*." (citations omitted)). Plaintiff has testified that he ended his relationship with Cook because Cook "proved to be dishonest and unreliable." (Sullivan Tr. 42:23–43:5; Pl.'s Sailer 56.1 Resp. ¶ 23.) The parties do not dispute that Gottshall had "legal troubles," "worked for two different operators simultaneously, was fired by both operators for financial malfeasance, was a convicted felon, and spent time in prison," and that Plaintiff testified that "[e]verybody in the industry knew that."[14] (Pl.'s Sailer 56.1 Resp. ¶ 17 (alteration in original).)

---

[14] Paragraph seventeen of Sailler's Rule 56.1 statement states:

> Before their business relationship commenced, Plaintiff was aware of FAA actions involving NextFlight. At the time, he did not consider the actions "particularly concerning" and decided to do business with NextFlight because of the favorable contract terms. At some point during Plaintiff's business relationship with NextFlight, he also learned of legal troubles surrounding NextFlight's chief pilot, Benjamin Gottshall, who worked for two different operators simultaneously, was fired by both operators for financial malfeasance, was a convicted felon, and spent time in prison. According to Plaintiff, "[e]verybody in the industry knew that."

(Pl.'s Sailer 56.1 Resp. ¶ 17 (citations omitted).) Plaintiff denied paragraph seventeen but only offered evidence contesting that Gottshall was not the chief pilot of NextFlight at the time Plaintiff terminated his relationship with NextFlight. (*Id.*) Because Plaintiff did not contest any other facts asserted in the paragraph, the Court deems the rest of the paragraph admitted. *See Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S de R L de C.V.*, 627 F. Supp. 3d 408, 412 n.1 (S.D.N.Y. 2022) (observing that a party controverting any assertion must "support its position by citing to admissible evidence in the record" (quoting *Pape v. Bd. of Educ.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013))); *Ringel v. County of Nassau*, No. 18-CV-1930, 2021 WL 4316715, at *2 (E.D.N.Y. Sept. 22, 2021) ("In moving for summary

Plaintiff also contends that Gottshall "pled guilty in Pennsylvania to unlawful use of a computer, a third-degree felony." (Pl.'s Aff. ¶ 29.) However, the list of names in the email alone does not impute Cook's and Gottshall's reputation or conduct to Plaintiff nor does it directly attack Plaintiff's professional abilities, character, or quality.[15] *See Staley*, 2024 WL 3835518, at *12 (explaining that defamatory *per se* statements that tend to injure another in his or profession must "impute[ ] incompetence, incapacity or unfitness in the performance of one's profession," amounting "to an attack on plaintiff's professional ability" and constitute "more than a general reflection upon [plaintiff's] character or qualities." (alterations in original) (citation omitted)); *Allen v. CH Energy Grp., Inc.*, 872 N.Y.S.2d 237, 239 (App. Div. 2009) (affirming trial court's determination that statement was defamatory *per se* because the "statement asserted grossly improper conduct *by plaintiff*, the existence of proof of such conduct, and that plaintiff was fired because of that conduct" (emphasis added)); *Clemente*, 711 N.Y.S.2d at 74 (concluding the contents of a letter were not defamatory *per se* because criticizing a public agency and its procedures were "not an attack directed solely at plaintiff," and "did not address the [ability of plaintiff] to practice his profession" (alteration in original) (citations omitted)); *see also* 43A N.Y. Jur. 2d Defamation and Privacy § 55 (describing statements that are actionable *per se* as

---

judgment or answering such a motion, litigants in this District . . . must support [their] position by citing to admissible evidence from the record." (citing Local Civ. R. 56.1(a)–(b), (d))). The Court deems admitted Sailler's assertions to which Plaintiff's responses lack citations to admissible evidence. Nevertheless, the Court construes all evidence in favor of Plaintiff, as the nonmovant. *Radwan*, 55 F.4th at 113.

[15] The cases Plaintiff relies on in support of his argument that listing his name along with Gottshall's constitutes defamation only demonstrate that directly accusing a plaintiff of being a thief or of stealing is actionable per se. *See, e.g.*, *Jamal v. Weil*, 2012 NY Slip Op 33575, 2012 WL 10902024, at *2 (Sup. Ct. 2012) (concluding that email stating that the defendant and someone else "are in no way saying the money was not *stolen we know it was*" constituted libel *per se* against the plaintiff because a "statement that accuses one of stealing or swindling or being a thief in connection with one's business is defamatory *per se*" (citing *Epifani v. Johnson*, 882 N.Y.S.2d 234, 243 (App. Div. 2009))). (Pl.'s Opp'n 16 (citing *Jamal*, 2012 WL 10902024, at *2).)

imputing "dishonest, fraudulent, unethical, or dishonorable practices *on the part of a person in the conduct of the person's* business" (emphasis added)).

Therefore, the Court cannot find as a matter of law that the October 3, 2019 Email is substantially true.

### ii. The October 3, 2019 Email does not contain a protected statement of opinion

Defendants argue that the statement "I believe the same shenanigans may [be] continuing over there" is non-actionable opinion because (1) the word "shenanigans" "lacks a precise meaning" and is subject to different interpretations, (Sailler's Mem. 13; ASG Mem. 10; Sailler's Reply 5); (2) the "colloquial" and "imprecise" nature of the word shenanigans, the inability to discern its truth in context, and Sailler's use of qualifying language "I believe" and "may," when reading the email as a whole, signal that the statement is her opinion, (Sailler's Mem. 13; ASG Mem. 10–11); (3) it constitutes "mixed fact-opinion" since it was "based upon and supported by the allegations in [Sailler's] email about unsatisfied flights, failing to issue refunds, and other issues" that were "conveyed to her by others" that "she deemed credible based on personal experience" and the email "outlined her understanding of the facts" to "warn others about the risk of doing business with Plaintiff," (Sailler's Mem. 14–15; Sailler's Reply 6). Defendants contend that Plaintiff admitted "that Ms. Sailler's e-mail set forth truthful, factual statements" and that "shenanigans" refers only to the "truthful facts set forth in the e-mail," and argue that his "regret" over his "voluntary choice to knowingly associate with questionable people" does not overcome the mixed fact-opinion relationship. (Sailler's Reply 5, 7.) Defendants argue that Plaintiff cites no authority, nor have they found any, supporting that Sailler was to disclose in the email her purported motivation rather than the facts underlying her statement and note that "none

of the 'facts' that Plaintiff now claims should have been disclosed . . . were relevant or required disclosure." (*Id.* at 6.)

Plaintiff argues that Sailer's statement "I believe the same shenanigans may [be] continuing over there" is not an opinion because Sailler's subjective belief "did not convert a statement of fact to an opinion" in light of her "role in the industry and the force with which she sent her message." (*Id.* at 10.) He contends that "a reasonable juror could find that her words have weight and that when she says, 'I believe [the same shenanigans may [be] continuing over there]' in the context in which she said it[], it is substantially accurate, supported by some objectively verifiable evidence, and can be taken by her intended audience as fact" because Sailler is "well-known" and "a facilitator in the industry" (*Id.* at 10–11.) He also argues that even if the statement were an opinion, it would be actionable because it (1) was an "expression of an opinion intended to be believed" and "made recklessly without regard to his truth or falsity" as evidenced by Sailler "let[ting] the offending statements linger, even when told they [were not] true" and admitting that she sent the email to "punish Sullivan for his perceived mistreatment of [her] friend," Moisey, (*id.* at 11–13); (2) was "at most, a hybrid of opinion and fact" that was objectively verifiable, (*id.* at 13–14); and (3) relied on facts that Sailler withheld from the email that would alter the implication of the statement, including that he had a recent dispute with Moisey, Moisey was Sailley's friend, and the email was intended to "exert pressure on Sullivan to 'make things right with Moisey," (*id.* at 14–17) He asserts that Sailler attempted to "obfuscate the reason" for her email by testifying that Moisey was an associate rather than a friend but notes that this is refuted by Moisey signing off an email to Sailer with "LOVE YOU." (*Id.* at 9–10 (citations omitted).)

"Ordinarily, opinion statements have absolute protection, and are non-actionable since they are 'not capable of being objectively characterized as true or false.'" *Mestecky v. N.Y.C.*

33

*Dep't of Educ.*, 791 F. App'x 236, 239 (2d Cir. 2019) (quoting *Celle*, 209 F.3d at 178).

"Expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Crowley*, 576 F. Supp. 3d at 148 (quoting *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008)). "Distinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task." *Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995); *see also Sheindlin v. Brady*, 597 F. Supp. 3d 607, 625 (S.D.N.Y. 2022) (same). "[T]he determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court." *Rapaport v. Barstool Sports Inc.*, No. 22-2080, 2024 WL 88636, at *2 (2d Cir. Jan. 9, 2024) (quoting *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985)). In distinguishing between opinion and fact, New York courts generally consider:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Rapaport*, 2024 WL 88636, at *2 (quoting *Brian*, 87 N.Y.2d at 51). "[A] statement of fact will not be transformed into a statement of opinion solely by use of language expressing uncertainty or qualification." *Elias*, 872 F.3d at 111 (citing *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 154 (1993)); *see Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 305 (S.D.N.Y. 2023) ("[A] defamatory statement of fact cannot be immunized by pairing it with 'I believe.'" (internal quotation marks omitted) (quoting *Thomas H. v. Paul B.*, 18 N.Y.3d 580, 585 (2012))); *Gross*, 82 N.Y.2d at 155 (explaining that "if the statement 'John is a thief' is actionable when considered in its applicable context, the statement '*I believe* John is a thief' would be equally actionable when placed in precisely the same context"). "Ultimately, '[t]he dispositive inquiry

34

. . . is whether a reasonable reader could have concluded that [the statements were] conveying facts about the plaintiff.'" *Rapaport*, 2024 WL 88636, at *2 (alterations in original) (quoting *Gross*, 82 N.Y.2d at 152).

Statements of opinion "may yet be actionable if they imply that the speaker's opinion is based on the speaker's knowledge of facts that are not disclosed to the reader," *Elias*, 872 F.3d at 111 (quoting *Levin*, 119 F.3d at 197), "because a reasonable listener or reader would 'infer that the speaker [or writer] knows certain facts, unknown to [the] audience, which support [the] opinion and are detrimental to the person [toward] whom [the communication is directed],'" *Gross*, 82 N.Y.2d at 149 (alterations in original) (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290 (1986)). *See Levin*, 119 F.3d at 197 (noting that the Supreme Court has "explained that the United States Constitution offers no wholesale protection for so-called 'expressions of opinion' if those expressions imply assertions of objective fact" (quoting *Milkovich v. Lorain J.*, 497 U.S. 1, 18 (1990))). However, "a proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture." *Rapaport*, 2024 WL 88636, at *13 (quoting *Gross*, 82 N.Y.2d at 154). "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact." *Levin*, 119 F.3d at 197 (citing *Gross*, 82 N.Y.2d at 155). Where "the predicate facts are disclosed but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity, the opinion may be an actionable defamatory opinion." *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 281 (S.D.N.Y. 2016) (internal quotation marks and brackets omitted) (quoting *Silsdorf v. Levine*, 59 N.Y.2d 8, 15–16 (1983)); *see Moraes v. White*, 571 F. Supp. 3d 77, 96–97 (S.D.N.Y. 2021) (quoting same); *Jacobus v. Trump*, 51 N.Y.S.3d 330, 337–38 (Sup. Ct. 2017), (quoting same), *aff'd*, 64 N.Y.S.3d 889 (App. Div. 2017); *see also*

*LoanStreet, Inc. v. Troia*, No. 21-CV-6166, 2022 WL 3544170, at *4 (S.D.N.Y. Aug. 17, 2022)
("[I]f the facts upon which an opinion is based are set forth for the reader, and the plaintiff
alleges that both the opinion and the facts upon which it is based are false, the opinion and facts
may form the basis of the defamation claim.").  "[O]pinions based on false facts are
actionable . . . against a defendant who had knowledge of the falsity or probable falsity of the
underlying facts." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 114 (2d Cir. 2010) (internal
quotation marks omitted) (quoting *Davis*, 754 F.2d at 86); *see IME Watchdog, Inc. v. Gelardi*,
No. 22-CV-1032, 2024 WL 4350498, at *17 (E.D.N.Y. Sept. 30, 2024) ("[O]pinions based on
false facts are actionable only against a defendant who had knowledge of the falsity or probable
falsity of the underlying facts." (alteration in original) (quoting *Hotchner v. Castillo-Puche*, 551
F.2d 910, 913 (2d Cir. 1977)).

       The statement "I believe the same shenanigans may [be] continuing over there," (*see*
Email dated Oct. 3, 2019), is not protected opinion because, reading the email as a whole, a
reasonable reader could conclude that the sentence was conveying as fact that Plaintiff was
continuing to not complete flights and refuse to issue refunds at MJS.  While the wording of the
sentence, particularly the use of the word "may," strongly suggests Sailler is speculating that
Plaintiff is not completing flights and refusing to issue refunds at MJS, qualifier language does
not alone form an opinion.  *See Elias*, 872 F.3d at 111.  In the broader context of the email and
surrounding circumstances, *see Rapaport*, 2024 WL 88636, at *2, Sailler's audience of operators
could construe her email as conveying facts about Plaintiff despite the qualifying language.  The
word "shenanigans" by itself lacks a precise meaning and may be considered metaphorical or
loose language, but in the context of the email, "same shenanigans" is readily understood to be
referring to Plaintiff, with Metro and three other individuals, booking prepaid trips, failing to
complete the flights, and not refunding the cost of the unfulfilled flights and is capable of being

proven true or false.

Neither party disputes Sailler's influence in the aircraft industry and her duty to "warn about bad actors."  A reasonable reader could find that Sailler's statement "I believe the same shenanigans may [be] continuing over there" when read together with the preceding factual assertions and the language that immediately follows — "If anyone has any Operator/Broker horror stories to share I encourage it to save us all the headache" and "I know many of you folks outsource so I wanted to give a heads up!"  — was warning operators that doing business with Plaintiff at MJS posed a concrete risk of losing money on prepaid, unfulfilled flights.  *See, e.g.*, *Moraes*, 571 F. Supp. 3d at 87–88, 97 (concluding that Facebook posts by a nanny's former employer made six months after their employment relationship ended warning 2,300-member mothers about the nanny's capacity to stalk and harass with an "urgent solicitation" for additional information "could fairly be read as conveying that the nanny posed a continuing if not escalating danger" and a "reasonable reader could readily conclude that only a person with a solid factual basis to fear such stalking would call out a former nanny as a stalker and harasser in a post to thousands of other parents of young children").  "Thus, the circumstances under which these accusations were published 'encourag[ed] the reasonable reader to be less skeptical and more willing to conclude that th[ey] stat[ed] or impl[ied] facts.'"  *Gross*, 82 N.Y.2d at 147 (citation omitted); *see Whitney Info. Network, Inc. v. Weiss*, No. 06-CV-6569, 2008 WL 731024, at *5 (E.D.N.Y. Mar. 18, 2008) (quoting same and holding that a reasonable person could read the opinion statements in defendant shareholder's email to other shareholders as conveying facts about the plaintiff because, *inter alia*, the "fact-laden context" of the email, which was to update "fellow shareholders regarding the retention of legal counsel and other experts to defend the shareholders' interests," implied a basis in fact); *see also Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 152 (2d Cir. 2000) (concluding that statements describing an attorney as an

"ambulance chaser" interested only in "slam dunk cases" could reasonably be construed as objective facts in "fact-laden context" in which the statements were made and as implying that the attorney had "engaged in unethical solicitation" that could be proven true or false).

Even if the statement was an opinion, the Court cannot conclude as a matter of law that it is non-actionable because, as discussed in Section II.b.i, *supra*, a reasonable jury could find the facts in the email that the statements are based on — that Plaintiff, with Metro, Gottshall, Cook, and Justin Wood, has been booking prepaid trips, failing to complete the flights, and not refunding brokers the cost of the unfulfilled flights — are false. *See Enigma Software*, 194 F. Supp. 3d at 281 (explaining that "[w]here the predicate facts are disclosed but are false, such that the disparity between the stated facts and the truth would cause a reader to question the opinion's validity, the opinion may be an actionable defamatory opinion" (internal quotation marks, brackets, and citations omitted)); *see, e.g.*, *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 357, 383 (S.D.N.Y. 1998) (finding actionable the opinion that the plaintiff "liked the limelight" because the plaintiff had alleged that the factual basis disclosed in the same article, that the plaintiff "sought interviews with CNN, NBC and other news outlets," was false). If the facts are deemed false, a reasonable jury could also find that Sailler had knowledge of the "probable falsity" in light of her testimony that she sent the October 3, 2019 Email based on her own "belief" of what was "possible" given Plaintiff's "reputation." (Sailler Tr. 61:8–62:1.) *See DiFolco*, 622 F.3d at 114 (reversing dismissal of a defamation claim based on opinion statement that the plaintiff "relied on cleavage and makeup to advance her career, ignored directions, refused 'alternate takes,' pouted, and was not a team player" because the plaintiff alleged that the defendants knew of the falsity of the underlying facts); *Wexler v. Allegion (UK) Ltd.*, No. 16-CV-2252, 2017 WL 946301, at *6 (S.D.N.Y. Mar. 9, 2017) (holding that the defendants' alleged statements that the plaintiff's work had been "unsatisfactory" and he was "unworthy of

continued employment" may be actionable opinion because they "may be found to be based on false facts within [the former employers'] knowledge").

The Court therefore denies Defendants' motion for summary judgment on the ground that the statement in the October 3, 2019 Email "I believe the same shenanigans may [be] continuing over there" is protected opinion.

### iii.    The October 3, 2019 Email is protected by the common interest privilege, but triable issues of fact exist as to whether Sailler abused the privilege by acting with malice

Defendants argue that the October 3, 2019 Email is protected by the common interest privilege because Sailler emailed operators in the "same aviation chartering industry" with "a common interest in identifying bad actors and thus protecting other colleagues in the industry from falling prey to improper business practices." (ASG Mem. 12, 14.) Sailler contends that the emailed operators "were part of a professional 'alliance'" and she conformed to the alliance's standard "practice" of "shar[ing] positive and negative business dealings involving other brokers, managers, and other industry members" and "warn[ing] each other of the risk of conducting business with certain companies and individuals based upon personal experience." (Sailler's Mem. 16–17.) Defendants argue that Plaintiff testified that the purpose of the October 3, 2019 Email was to "protect the industry from that pain and warn good people about bad actors," (Sailler's Mem. 17; ASG Mem. 12–13; Sailler's Reply 1–2), and conceded that the circumstances prompting the October 3, 2019 Email were analogous to those that prompted Plaintiff to send a "similar warning email to industry participants" about "bad actors" in the industry that was the subject of a prior libel suit against Plaintiff that he won on summary judgment, (ASG Mem. 13 (citation omitted)).

Defendants also argue that Plaintiff cannot defeat the privilege because there was no excessive publication, and he cannot show malice. Defendants contend there was no excessive

publication because Sailler "limited her e-mail to those with whom she shared a professional

alliance," and "Plaintiff could not identify any broker that received the email and admitted that

this claim was based upon hearsay and speculation." (Sailler's Mem. 17–18; Sailler's Reply 1,

4.) Sailler argues that Plaintiff admitted to having no reason to believe that the email was sent to

anyone other than operators, and admitted in his responses to ASG's interrogatories that

"Sailler's email was sent to 'approximately 150 private airplane operators . . . and then

forwarded on to more than 500 charter brokers,' all participants in the aviation industry that both

Plaintiff and Sailler belong to." (Sailler's Mem. 17–18; Sailler's Reply 1, 4.) Defendants

contend that Plaintiff cannot show malice because (1) he "agreed that [Sailler's] motive was

protection and concern for private aviation operators" and has admitted the statements in the

email are true, (Sailler's Mem. 17–18; Sailler's Reply 2); (2) Plaintiff's "last-ditch effort to avoid

dismissal" by claiming for the first time that the October 3, 2019 Email "was motiv[at]ed by

retribution for a business dispute with Kelly Moisey or to impugn Plaintiff's reputation" is

improper and even if the Court were to accept the "new theory of motive," Plaintiff's "earlier

admission" that Sailler's motive was "the protection of her industry" "defeats any finding that

spite or ill-will [were Sailler's] *sole* motive for sending the email," (Sailler's Reply 3); and (3)

"at most, the fact that [Sailler] communicated to Plaintiff that she would further alert the

operators of Plaintiff's corrected/proper business practices if Plaintiff reimbursed Ms. Moisey –

consistent with industry practices – only reinforces [Sailler's] role as a trusted advisor sharing

positive and negative interactions with operators in the industry," (*id.* at 3 n.2).

     Plaintiff argues that (1) "based on personal experience" it is "often *not* the case" that

"brokers/brokers, operators/operators and brokers/operators all share a common interest," (Pl.'s

Opp'n 19; Pl.'s Aff. ¶¶ 46–51); (2) "Defendants have failed to introduce *any* evidence of

[Plaintiff's] supposedly poor reputation in the industry other than through [Sailler's] self-serving

deposition testimony," and Sailler admitted in her deposition that "she was unaware of a single instance where [Plaintiff], personally, had engaged in a single practice that she ascribed to [Metro]," (Pl.'s Opp'n 19); and (3) Sailler has admitted that the email was intended to "pressure [Plaintiff] to 'make it right' with [Moisey]," and there is no evidence that Sailler sent her email "out of a concern for operators" other than her "self-serving testimony," (*id.* at 18, 21). He also contends that "summary judgment is precluded" because there is a genuine dispute of material fact as to the statements made during the October 5, 2019 Call. (*Id.* at 21 n.6.)

"New York common law affords qualified protection to defamatory communications made by one person to another upon a subject in which both have an interest." *Meloff*, 240 F.3d at 145 (quoting *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 98 (2d Cir. 2000)). "[T]he common interest privilege is 'broadly applied' such that "[t]he parties need only have such a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information.'" *Hodges v. Lutwin*, No. 22-974, 2023 WL 3362836, at *2 (2d Cir. May 11, 2023) (second alteration in original) (quoting *Anas v. Brown*, 702 N.Y.S.2d 732, 732 (4th Dep't 2000)). "The shared interest need not be identical; the [communicants] only need to have a 'corresponding' interest." *Hodges v. Lutwin*, 595 F. Supp. 3d 12, 19 (S.D.N.Y. 2022) (quoting *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011)), *aff'd*, 2023 WL 3362836. The qualified privilege creates "a rebuttable presumption of good faith that may constitute a complete defense." *Meloff*, 240 F.3d at 145–46 (quoting *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 62). "However, this qualified privilege may be overcome if plaintiffs can show that the defamatory statements were excessively published or motivated by malice." *Hodges*, 2023 WL 3362836, at *2 (quoting *Konikoff*, 234 F.3d at 98). "A defamatory statement is excessively published when 'it was made to persons with an insufficient interest in it for it to warrant protection.'" *Id.* at *2 (quoting *Konikoff*, 234 F.3d at 98).

"Malice can take two forms: (1) common law malice, *i.e.*, 'spite or ill will,' or (2) actual malice, *i.e.*, 'knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not.'" *Hodges*, 2023 WL 3362836, at *3 (quoting *Liberman*, 80 N.Y.2d at 437–38). Common law malice "will defeat the privilege only if it is 'the one and only cause for the publication.'" *Konikoff*, 234 F.3d at 98–99 (quoting *Liberman*, 80 N.Y.2d at 439); *Morsette v. "The Final Call"*, 764 N.Y.S.2d 416, 421 (App. Div. 2003) (explaining that "a triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and that there must be some evidence that the animus was 'the one and only cause for the publication'" (quoting *Stukuls v. New York*, 42 N.Y.2d 272, 282 (1977))). "If the defendant's statements were made to further the interest protected by the privilege, it matters not that defendant also despised plaintiff." *Meloff*, 240 F.3d at 146 (quoting *Liberman*, 80 N.Y.2d at 439). "Constitutional or 'actual' malice means publication 'with [a] high degree of awareness of [the publication's] probable falsity' or while 'the defendant in fact entertained serious doubts as to the truth of [the] publication.'" *Konikoff*, 234 F.3d at 99 (quoting *Liberman*, 80 N.Y.2d at 438). "[P]laintiffs cannot establish actual malice on the basis that the . . . defendants declined to consider plaintiffs' account of the events underlying the allegedly defamatory statements or failed to conduct their own investigation," *Hodges*, 2023 WL 3362836, at *4 (citing *Sanderson v. Bellevue Maternity Hosp. Inc.*, 686 N.Y.S.2d 535, 537–38 (App. Div. 1999); and then citing *Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*, 84 N.Y.2d 786, 793 (1995)), "unless [the failure to investigate] evidences an intent to avoid the truth," *Sweeney*, 84 N.Y.2d at 793 (citing *Harte-Hanks Commc'n, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989)).

1.    **The common interest privilege applies to the October 3, 2019 Email**

Sailler and the operators in the private charter aviation industry that received her email share a common interest in warning each other of "bad actors" and negative business dealings. Therefore, the common interest privilege applies. *See, e.g.*, *Hodges*, 2023 WL 3362836, at *2 (members of teacher's organization shared common interest in "protecting the welfare of the children" in the plaintiff's dance programs and receiving information that the plaintiff's dance company "allegedly sent an obscene video to two minor students in a member's school"); *Brockman v. Frank*, 565 N.Y.S.2d 426, 427 (Sup. Ct. 1991) (members of a tennis club shared a common interest in unsportsmanlike conduct of its members); *see also* N.Y. Jur. 2d Defamation and Privacy § 170 (observing that under New York law a "qualified privilege attaches to the statements and communications made in connection with the various activities of membership associations" including "professional associations, and similar organizations").

Plaintiff's argument that Defendants must demonstrate that all members of the private aviation industry in various permutations — "brokers/brokers, operators/operators, and brokers/operators" — share a common interest, (Pl.'s Opp'n 19), is incorrect. Defendants are only required to demonstrate that Sailler and the operators to whom she published the October 3, 2019 Email shared an interest in the email's subject. *See Meloff*, 240 F.3d at 145. Plaintiff attests that operators do not always share the same interests as they sometimes compete for the same pool of clients, (*see* Pl.'s Aff. ¶ 48), but this is insufficient to create a genuine issue of material fact as no reasonable jury could find that operators would not share an interest in knowing, if true, that brokers were engaging in the questionable business practices Sailler claimed in the October 3, 2019 Email. *See Anderson*, 477 U.S. at 252 (explaining that a genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for

43

the [nonmoving party]").  Moreover, even if it is true that the interests of operators are not fully aligned, the qualified privilege does not require that the interests between the parties be identical.  *See Hodges*, 595 F. Supp. 3d at 19 (stating that the common interest privilege "requires that the communicants share a *common, mutual,* or *corresponding* interest, not an *identical* interest" (quoting *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 437 (E.D.N.Y. 2013))).

### 2.  There is a triable issue of fact as to whether Sailer acted with malice

As to common-law malice,[16] there is evidence supporting that Sailer's motive for sending the email was to warn the industry, including: (1) Sailer's testimony that she sent the email to "inform the operator sector of the industry that if they choose to do business with the aforementioned companies, just to beware" and that "it's not uncommon for [her] or anyone else to share their business dealings in this fashion," (Sailer Tr. 71:10–72:18); (2) Plaintiff testifying "yes" when asked if it was his "understanding" that the "purpose" of the October 3, 2019 Email was "to protect the industry from that pain and warn good people about bad actors," (Sullivan Tr. 137:14–25; Pl.'s Sailer 56.1 Resp. ¶ 44); (3) Sailer's testimony that she "would use the term friend loosely" when describing her relationship with Moisey, (Sailer Tr. 67:13–20), and would instead describe them as "associates in the aviation industry" who have "been doing business together for many years," (*id.* at 105:16–19).  Evidence supporting Plaintiff's contention that "spite or ill will" was Sailer's sole motive for sending the email includes:[17] (1) Plaintiff denied

---

[16]  Plaintiff does not respond to Defendant's argument that he cannot defeat the common interest privilege by showing excessive publication.  Rather, he argues that the common interest privilege, if the Court finds it applies, is defeated solely on the basis of malice.  (*See* Pl.'s Opp'n 8–10, 17–21.)  Accordingly, the Court does not address whether the October 3, 2019 Email was excessively published.

[17]  Defendants argue that Plaintiff raises the theory that Sailer's sole motive for sending the email was "spite or ill will" for the first time in Plaintiff's Opposition to Defendants' Motion

Defendants' contention that he conceded in his deposition that Sailler's intent was to warn other operators, (*see* Pl.'s Sailler 56.1 Resp. ¶ 17), and the Court notes that Plaintiff testified shortly afterwards that the October 3, 2019 Email was not true, (*see* Sullivan Tr. 138:1–5); (2) Plaintiff's argument that during the October 5, 2019 Call, Sailler admitted that Moisey was her friend in telling him that he "did a very not nice thing to [her] friend" Moisey, (Pl.'s Aff. ¶ 35); (3) Sailler was shown an email between herself and Moisey during her deposition in which Moisey signed off "LOVE YOU," (Sailler Tr. 105:8–18); (4) Sailler admitted to telling Plaintiff during the October 5, 2019 Call that she was willing to retract the email if "Plaintiff made sure to 'make it right' with" Moisey, (*see* Sailler's R&O No. 15); (5) Sailler's testimony suggests that her email may have been based on her own "belief" of what was "possible" based on Plaintiff's "reputation," (Sailler Tr. 61:8–62:13; *see* Pl.'s Opp'n 19–20.)  It is for a jury not this Court to weigh the conflicting evidence to determine whether Sailler sent the October 3, 2019 Email to warn the industry of bad actors or solely as retaliation for the StarFlight refund dispute.  *See Hayes*, 84 F.3d at 619 ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

As to actual malice, a reasonable jury could find that Sailler acted "with [a] high degree of awareness of [the publication's] probable falsity." *Konikoff*, 234 F.3d at 99 (alterations in original) (quoting *Liberman*, 80 N.Y.2d at 437).  Defendants have not shown that Plaintiff was

---

for Summary Judgment (the "Opposition") (Sailler's Reply 3), but the Court notes that Plaintiff alleged in the Amended Complaint that during the October 5, 2019 call, Sailler "outlined a personal vendetta against [him], and expressed that the objective of the email was for Sullivan to 'stay in his lane' as a charter broker and get out of the jet management business entirely."  (Am. Compl. ¶ 54.)  In addition, his counsel's line of questioning of Sailler during her deposition, including to determine whether she and Moisey were friends, (Sailler Tr. 67:13–20, 105:14–19), appears to be intended to substantiate that the true motive of the email was retaliation.  Thus, the Court finds that Plaintiff is not raising a new theory regarding Sailler's motive.

involved in any other instances of taking client money for prepaid trips and refusing to refund

customers. Sailler testified to having investigated Plaintiff's possible involvement in refusing to

refund clients for uncompleted trips, but expressly admitted that her findings as to Plaintiff had

nothing to do "with taking client money and not refunding it for canceled trips":

> Q. What did you do to investigate the possibility that Mr. Sullivan
> was involved in those business dealings, as you have referred to
> them?
> A. I had saw e-mail correspondence between him and others, and he
> was marketing himself as an affiliate of My Jet Saver when his
> aircraft were still in the conformative process, not yet on the
> certificate.
> Q. But does that have anything to do with taking client money and
> not refunding it for canceled trips?
> A. It doesn't. It's just a series of poor business practices that seem
> to be a common theme.

(Sailler Tr. 62:15–63:3.) In addition, as noted previously, Sailler's testimony suggests that her

email may have been based on her own "belief" of what was "possible" based on Plaintiff's

reputation rather than concrete instances of misconduct by Plaintiff. (*Id.* at 61:8–62:1.)

Therefore, the Court denies Defendants' summary judgment motion based on

Defendants' argument that the October 3, 2019 Email is protected by the common interest

privilege.

### iv. Plaintiff may not raise claims for defamation per quod and defamation by implication for the first time at summary judgment

Defendants argue that Plaintiff's allegations of defamation per quod and defamation by

implication for the first time in opposing their summary judgment motion is impermissible by

law, and Plaintiff cannot advance legal theories now for which "no discovery was taken[] and no

motion practice held." (ASG Reply 4–5.) Defendants further argue that even if the Court were

to recognize the theories, the claims would fail because "Plaintiff wholly failed to identify any

extrinsic facts that would give the [e]mail even a defamatory implication," "admits that the

statements are true," and "failed to show or plead special damages" for defamation per quod. (ASG Reply 5–7.)

Plaintiff argues that in paragraphs 77 through 79 of the Amended Complaint,[18] "while not explicitly labeling the cause of action," he states a claim for "defamation *per quod*" or "defamation by implication" in direct contravention of "Defendants' perspective" that "associating unfair and deceptive business practices to one whose reputational guilt is established by the subjective belief of the speaker immunizes that speaker from liability." (Pl.'s Opp'n 7–8.)

Plaintiff has improperly raised new claims for defamation per quod and defamation by implication, and the Court declines to consider them. "An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims." *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) (summary order) (citation omitted); *see also Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach merits of argument raised for first time in opposition to summary judgment).

"In a claim of defamation per quod, 'no defamatory statement is present on the face of the communication but a defamatory import arises through reference to facts extrinsic to the communication.'" *Fairstein v. Netflix, Inc.*, 553 F. Supp. 3d 48, 63 (S.D.N.Y. 2021) (emphasis omitted) (quoting *Ava v. NYP Holdings, Inc.*, 885 N.Y.S.2d 247, 251 (Sup. Ct. 2009)). Although the law is unclear as to whether defamation per quod is a distinct cause of action, *see, e.g.*, *Goldfarb*, 663 F. Supp. 3d at 300–01 (collecting cases and noting that the court "was unable to

---

[18] Plaintiff cites to the following allegations in the Amended Complaint: "The allegations contained in the Email carry a precise meaning so as to give rise to a clear factual implication of criminal and/or unethical conduct on Sullivan's part," (Am. Compl. ¶ 77); "ASG's Email allegations against Sullivan were objectively capable of proof or disproof," (*id.* ¶ 78); and "Both (a) the full context of ASG's Email, and (b) the broader context of the industry and the relationship of the parties involved, signaled to the reader the nature of the allegations as an assertion of purported fact," (*id.* ¶ 79).

identify any Second Circuit opinion addressing the question, and courts in this District ordinarily note that the question remains unsettled under New York law"), district courts analyzing the cause of action have required plaintiffs "to show that the challenged language was capable of communicating the alleged defamatory idea when words were given meaning not ordinarily attributed to them or due to external factors." *Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 145 (S.D.N.Y. 2022) (quoting *Fairstein*, 553 F. Supp. 3d at 63). "Defamation by implication involves 'false suggestions, impressions and implications arising from otherwise truthful statements,'" *Levin*, 119 F.3d at 196 n.5 (quoting *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 381–82 (1995)); *see Kesner v. Dow Jones & Co., Inc.*, No. 22-875, 2023 WL 4072929, at *1 (2d Cir. June 20, 2023) (quoting same), and differs from . . . allegedly 'false statements of verifiable fact, with inferences flowing from those facts,'" *Levin*, 119 F.3d at 196 n.5 (quoting *Armstrong*, 85 N.Y.2d at 381–82). "To survive a motion to dismiss a claim for defamation by implication [under New York law] . . . the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Kavanagh v. Zwilling*, 578 F. App'x 24, 24–25 (2d Cir. 2014) (alterations in original) (citing *Stepanov*, 987 N.Y.S.2d at 44). *See also Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 248 (S.D.N.Y. 2014) (distinguishing three kinds of libel claims as "*per se* libel, which is actionable on its face; *per quod* libel, which is actionable despite its apparent truth in light of extrinsic facts known to the audience; and libel by implication, in which the false statement is contained not in the statement's literal wording but rather its innuendo"), *aff'd*, 578 F. App'x 24.

Plaintiff's argument that the claims were pleaded but not labeled in the Amended Complaint is meritless. First, the three allegations that Plaintiff points to fail to state a claim for defamation per quod because they do not allege that the October 3, 2019 Email has a defamatory

meaning not apparent on its face.  In paragraph 77, Plaintiff alleges that the email carries "a precise meaning so as to give rise to a clear factual implication of criminal and/or unethical conduct on [Plaintiff's] part," (Am. Compl. ¶ 77), but he does not show that the email is defamatory when any words are "given meaning not ordinarily attributed to them" nor does he identify extrinsic facts that give rise to a defamatory meaning different than the meaning that he has alleged is shown on the email's face.  *Henry*, 629 F. Supp. 3d at 145 (explaining that plaintiffs claiming defamation per quod must "show that the challenged language was capable of communicating the alleged defamatory idea when words were given meaning not ordinarily attributed to them or due to external factors" (citation omitted)); *see, e.g.*, *Kavanagh*, 997 F. Supp. 2d at 254–55 (holding that the plaintiff failed to state a claim for libel *per quod* because it was implausible that the public reading the challenged statement "It has come to the attention of the Archdiocese that *the* victim in *the* Charles Kavanagh case has changed one of *his* claims, specifically concerning an overnight trip to Washington, D.C., during *the* victim's senior year of high school . . . would conclude that [the plaintiff] molested 'many' young victims" given the "unmistakable use of singular, as opposed to plural, definite articles and pronouns").  The allegations fail to state a claim for defamation by implication because Plaintiff is not alleging that the email is true; rather, the Amended Complaint is premised on the alleged falsity of the email.  *Levin*, 119 F.3d at 196 (explaining that defamation by implication "involves false suggestions, impressions and implications arising from otherwise truthful statements" (internal quotation marks and citation omitted)); *Kavanagh*, 997 F. Supp. 2d at 248 (explaining that libel by implication is a "false statement . . . contained not in the statement's literal wording but rather its innuendo").  The allegations also fail to make the requisite "rigorous showing" that the email can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference.  *Kavanagh*, 578 F. App'x at 24–25 (citation

49

omitted).  Rather than supporting defamation per quod or defamation by implication, the allegations appear to allege that the email constitutes a statement of fact rather than of opinion as the language of the allegations closely tracks the three-part test under New York law for distinguishing fact from opinion,[19] rendering it unlikely that Defendants or this Court would have been on notice that Plaintiff was relying on the three allegations to plead defamation per quod or by implication.

Second, as detailed in Section II.c.i, *infra*, Plaintiff did not plead special damages, which some courts have found to be required to allege defamation per quod.  *See Kavanagh*, 578 F. App'x at 25 (noting that plaintiff's "failure to plead special damages" for his libel per quod claim is a "fatal defect" (citation omitted)); *but see Goldfarb*, 663 F. Supp. 3d at 300 (stating that the "New York Court of Appeals has not been particularly clear about which approach New York follows — that is, whether New York requires proof of special damages to recover for a libel whose defamatory nature is apparent only given additional extrinsic facts.").

Therefore, the Court does not consider whether Plaintiff has stated a claim for defamation per quod or defamation by implication.

Accordingly, the Court denies Defendants' motion for summary judgment on their

---

[19]  *Compare* Am. Compl. ¶¶ 77–79 ("The allegations contained in the [e]mail carry a precise meaning so as to give rise to a clear factual implication of criminal and/or unethical conduct on Sullivan's part," "ASG's [e]mail allegations against [Plaintiff] were objectively capable of proof or disproof," and "Both (a) the full context of ASG's [e]mail, and (b) the broader context of the industry and the relationship of the parties involved, signaled to the reader the nature of the allegations as an assertion of purported fact."), *with Rapaport*, 2024 WL 88636, at *2 (outlining the three-part test for distinguishing fact from opinion as "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact" (citation omitted)).

asserted defenses to Plaintiff's libel *per se* claim — that the October 3, 2019 Email is substantially true, contains nonactionable opinion, and is protected by the common interest privilege.

### c.   Damages

Defendants argue that they are entitled to summary judgment limiting Plaintiff's damages to non-economic harm because he has failed to adduce evidence that he suffered "any damages let alone special damages," (ASG's Reply 7; ASG's Mem. 17; Sailler's Mem. 19; Sailler's Reply 8), and "the record shows no triable issue of fact that these special damages exist or their connection to [the October 3, 2019 Email]," (Sailler's Mem. 19–21; ASG Mem. 17–20).  In support, Defendants contend (1) "Plaintiff testified that, in the one-year period following [the October 3, 2019 Email], his business flourished, and he had to more than double his workforce," (Sailler's Mem. 20); (2) Plaintiff has "failed to show that current or prospective customers ceased business because of the email," (*id.*); (3) Plaintiff's calculations in his Affidavit are inadmissible because he provides no support for his calculations, (Sailler's Reply 7–8), and "did not retain or disclose an expert witness qualified to calculate and opine on" whether "he would have achieved higher commissions and earnings at MJS compared to Chicago Jets" nor "did Plaintiff himself conduct an analysis to support his 'expectations,'" (Sailler's Mem. 20–21 (citation omitted)): (4) Plaintiff "admitted that his calculation of damages stemming from lost profits is purely speculative," (ASG's Mem. 17–18), "any decrease in business in 2019 and 2020 was because of misaligned business operations and the COVID-19 pandemic," (Sailler's Mem. 20–21), and he received Paycheck Protection funds from the federal government, (Sailler's Reply 8.  Defendants contend that Plaintiff has failed to adduce any evidence to substantiate the approximately $1,275,000 in compensatory damages from alleged lost commissions and diminished value of services he asserted in written discovery.  (ASG Mem. 17.)  They also argue

that Plaintiff abandoned his damages claims because he did not oppose the arguments that he "lacks standing to claim damages belonging to his entities" and that his "speculatory calculations are inadmissible without a qualified expert opinion or supporting analysis." (Sailler's Reply 7–8.) Sailler argues that "if Plaintiff can show liability for his libel *per se* claim, his damages must be limited to a nominal amount of general damages." (Sailler Mem. 21.) Sailler also argues that Plaintiff lacks standing to pursue his sought-after damages because he was not a party to the "lease agreement drafts" between MJS and FLITE Partners LLC and the "management agreement" between LBC and FLITE Partners LLC agreements on which he bases his claims for "lost earnings and commissions" and any damages belong to his entities that are not named in this action. (Sailler's Mem. 19–20.)

Plaintiff argues that he is entitled to *per se* damages, (Pl.'s Opp'n 23–24), and has submitted an Affidavit "attesting to his damages" in the amounts of: (1) $74,958.33 for "contractual damages" due to "material alterations" MJS made to its negotiated management agreement with Plaintiff's company for aircraft N217PT "[a]fter receiving the October 3, 2019 Email," (*id.* at 21–22); (2) $343,164 for "damages" due to higher maintenance costs under Falcon 50's and LBC's lease agreements with Chicago Jet Group, (*id.* at 22–23); and (3) $33,333.33 in "additional damages" due to LBC changing its management agreement to require Plaintiff "earn back" $100,000 in profit before receiving his share," (*id.* at 21–23). Plaintiff also objects to a YouTube video that Sailler provided as an attachment to her motion that is "reporting to be a podcast in which Sullivan discusses his revenues" and is the basis for some of the admissions that Defendants claim Plaintiff has made regarding his revenues because it is "not authenticated, and is taken out of context." (*Id.* at 21 n.7.)

Under New York law, a defamation plaintiff may recover two types of compensatory damages: general damages and special damages. *See Robertson v. Doe*, No. 05-CV-7046, 2010

WL 11527317, at *2 (S.D.N.Y. May 11, 2010) (explaining that a defamation plaintiff may be

entitled to general damages or special damages), *aff'd sub nom. Robertson v. Dowbenko*, 443 F.

App'x 659 (2d Cir. 2011); *see also Glob. Auto, Inc. v. Hitrinov*, No. 13-CV-2479, 2021 WL

7367078, at *9 (E.D.N.Y. Aug. 20, 2021) ("There are two classes of compensatory damages for

defamation: (1) general damages; and (2) special damages." (quoting *Wachs v. Winter*, 569 F.

Supp. 1438, 1446 (E.D.N.Y. 1983))), *report and recommendation adopted*, 2022 WL 593613

(E.D.N.Y. Feb. 28, 2022).  Courts have defined general damages to include "damage to

reputation aris[ing] from the statement itself."  *Robertson*, 2010 WL 11527317, at *2 (citation

omitted); *see also Wolf St. Supermarkets, Inc. v. McPartland*, 487 N.Y.S.2d 442, 448–49 (App.

Div. 1985) (explaining that "the more customary types of *actual* harm inflicted by defamatory

falsehood include impairment of reputation and standing in the community, personal humiliation,

and mental anguish and suffering").  Special damages, on the other hand, "consist of the loss of

something having economic or pecuniary value which must flow directly from the injury to

reputation caused by the defamation."  *Celle*, 209 F.3d at 179 (internal quotation marks and

citations omitted); *see also Valada v. Cucciniello*, No. 22-CV-703, 2023 WL 2895225, at *3–4

(N.D.N.Y. Apr. 10, 2023) (same); *Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017,

2007 WL 2781246, at *15 (S.D.N.Y. Sept. 24, 2007) ("Under New York law, 'special damages'

are defined 'as the loss of something having economic or pecuniary value such as loss of profits,'

as opposed to other types of harm to reputation or community standing." (citation omitted)).  In

order to successfully plead special damages, a plaintiff must do more than plead "damages as a

round number with no attempt at itemization."  *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp.

3d 35, 51 (S.D.N.Y. Mar. 6, 2015) (citing *Drug Rsch. Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435,

441–42 (1960)), *aff'd in part*, 632 F. App'x 637 (2d Cir. 2015); *see also El Meson Espanol v.

NYM Corp.*, 521 F.2d 737, 740 n.2 (2d Cir. 1975) ("Such round figures, with no attempt at

itemization, must be deemed to be a representation of general damages." (citation omitted)). "Special damages 'must be fully and accurately stated, with sufficient particularity to identify actual losses.'" *Glob. Auto*, 2021 WL 7367078, at *9 (citation omitted).

"New York law has long recognized that '[w]hen statements fall within' established categories of *per se* defamation, 'the law presumes that damages will result, and they need not be alleged or proven.'" *Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011) (footnote omitted) (quoting *Liberman*, 80 N.Y.2d at 435); *see also Palin v. N.Y. Times Co.*, 113 F.4th 245, 268 (2d Cir. 2024) (finding that the plaintiff "was not . . . obliged to prove special damages because the challenged statements were defamatory *per se*"); *Paravas v. Tran*, No. 21-CV-807, 2022 WL 718842, at *7 (S.D.N.Y. Feb. 22, 2022) ("Defamation *per se* . . . includes statements impugning the plaintiff's business reputation and special damages need not be pled."), *report and recommendation adopted*, 2022 WL 718587 (S.D.N.Y. Mar. 10, 2022); *Yesner v. Spinner*, 765 F. Supp. 48, 52 (E.D.N.Y. 1991) ("It has long been the law in New York that a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation '*per se*', and therefore actionable without any proof of special damages."); *see also Celle*, 209 F.3d at 179 ("If a statement is defamatory *per se*, injury is assumed.").

This presumption of damages applies only to general damages. *See, e.g.*, *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003) ("Where a statement impugns 'the basic integrity' of a business, an action for defamation *per se* lies, and general damages are presumed." (citations omitted)); *Shah v. Levy*, No. 13-CV-2975, 2016 WL 6459805, at *5 (S.D.N.Y. Oct. 31, 2016) ("Presumed damages . . . include [ ] impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering." (alterations in original) (quoting *Van-Go Transp. Co. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 100 (E.D.N.Y. 1997))); *cf. Gallo v.*

*Montauk Video, Inc.*, 684 N.Y.S.2d 817, 818 (App. Term 1998) (explaining that, in cases of libel *per se*, "no special damages need be shown, since a presumption of actual damage to reputation arises from the statement itself entitling plaintiff to recover general damages"). Thus, while plaintiffs in defamation *per se* cases need not allege special damages in order to state a claim, courts have held that they must allege and prove special damages in order to ultimately recover those damages. *See Glob. Auto*, 2021 WL 7367078, at *9–10; *Fischer v. OBG Cameron Banfill LLP*, No. 08-CV-7707, 2010 WL 3733882, at *2 (S.D.N.Y. Sept. 24, 2010) ("The presumption of general damages in libel *per se* cases does not mean that the court can award substantial damages without plaintiff having adduced any evidence; it merely means that special damages need not be pleaded for the *per se* claim to be actionable." (citations omitted)); *Segel v. Barnett*, 226 N.Y.S.2d 141, 143 (Sup. Ct. 1962) ("Where a statement uttered is slanderous per se, the law presumes general damages to have been sustained, and it is not necessary, in order to justify a recovery on that ground, that the damages should have been specifically pleaded or proved. But when it is sought to recover special damages the same must not only be pleaded but proved." (citation omitted)); *cf. Steward v. World-Wide Autos. Corp.*, 189 N.Y.S.2d 540, 547 (Sup. Ct. 1959) (explaining that the New York Court of Appeals has held that "whenever special damage is claimed, the plaintiff must state it with particularity, in order that the defendant may be enabled to meet the charge" (citation omitted)).

### i. Plaintiff may not recover special damages because he did not specifically plead them

Plaintiff alleged "lost business opportunities" from five customers in the Amended Complaint but failed to plead the amounts with particularity.[20] Plaintiff alleged that he

---

[20]   The Court also notes that there is no evidence regarding the existence or precise amount of the alleged lost business opportunities, and Plaintiff did not mention them in the

"calculated his lost business opportunities resulting from the transmission of the [e]mail to be in the hundreds of thousands of dollars," (Am. Compl. ¶ 67), and that as "[a]s a direct and proximate result of the allegations in the [e]mail, [he] lost business opportunities with five customers — Barry Fetner ("Fetner"), Sean Siegal ("Siegal"), Barry Ritter ("Ritter"), John Cornwell ("Cornwell"), and Katie Sugrue ("Sugrue")" — who "all opted not to use Sullivan's charter brokerage business because of Sullivan's inability to quote a competitive price following the termination of the MJS contract," (*id.* ¶¶ 60–61). He alleged a loss of "at least $50,000" due to the termination of the Fetner contract, of "at least $55,000" due to the termination of the Siegal contract, of "at least $55,000" due to the termination of the Ritter contract, of "at least $65,000" due to the loss of the Cornwell contract, and of "at least $55,000" due to the loss of the Sugrue contract. (*Id.* ¶¶ 62–66.) All of Plaintiff's allegations regarding lost business opportunities are mere estimates of his anticipated loss and such approximations are insufficient because special damages "must be fully and accurately stated," *Glob. Auto*, 2021 WL 7367078,

---

Opposition and only generally alluded to lost business opportunities in his Affidavit. (*See* Pl.'s Aff. ¶ 86 ("I suffered unquantifiable damages as a result of *per se* defamation in lost contracts, higher prices paid to Carriers, loss of business to other Brokers who were getting better prices from the same Carriers, and shortened cash cycles due to lack of credit terms with Carriers.").) Even if Plaintiff had proffered proof, however, he would still be barred from recovery for failure to plead special damages with particularity. *See Glob. Auto, Inc. v. Hitrinov*, No. 13-CV-2479, 2021 WL 7367078, at *9–10 (E.D.N.Y. Aug. 20, 2021) (explaining that even in defamation per se cases, "[s]pecial damages must be fully and accurately stated, with sufficient particularity to identify actual losses" and finding that the plaintiffs were "only entitled to recover general damages, which [were] presumed as part of their successful libel *per se* claim" (citation and internal quotation marks omitted)); *Fischer v. OBG Cameron Banfill LLP*, No. 08-CV-7707, 2010 WL 3733882, at *2 (S.D.N.Y. Sept. 24, 2010) (explaining that "[t]he presumption of general damages in libel *per se* cases . . . merely means that special damages need not be pleaded for the *per se* claim to be actionable"); *Segel v. Barnett*, 226 N.Y.S.2d 141, 143 (Sup. Ct. 1962) ("Where a statement uttered is slanderous per se, the law presumes general damages to have been sustained, and it is not necessary, in order to justify a recovery on that ground, that the damages should have been specifically pleaded or proved. But when it is sought to recover special damages the same must not only be pleaded but proved." (citation omitted)).

at *9 (citations omitted), and "round figures, with no attempt at itemization, must be deemed to be a representation of general damages." *Drug Rsch. Corp.*, 7 N.Y.2d at 441 (citation omitted); *see Bilinski*, 96 F. Supp. 3d at 51 ("Pleading damages as a round number with no attempt at itemization alleges general rather than special damages."  (citation omitted)); *see also Procter & Gamble Co. v. Quality King Distribs., Inc.*, 974 F. Supp. 190, 198–99 (E.D.N.Y. 1997) (finding "insufficient as a matter of law" a distributor's allegation that a shampoo manufacturer's statements caused "at least $25 million" in lost business from three named customers).

Although not explicitly argued by Plaintiff, he appears to be contesting that the damages outlined in his Affidavit constitute special damages.  In his Affidavit and in the Opposition, Plaintiff avoids the term "special damages" and instead presents calculations for what he describes as "contractual damages," "damages," and "additional damages."  (Pl.'s Opp'n 21–23; Pl.'s Aff. ¶¶ 57–88.)  Regardless of how Plaintiff labels the damages he now seeks, the substance of his calculations demonstrate that he is seeking to recover lost profits due to "material alterations" MJS made to its negotiated management agreement with Plaintiff's company for the F50 aircraft, higher maintenance costs under Falcon 50's and LBC's lease agreements with Chicago Jet Group, and LBC altering its management agreement to require Plaintiff "earn back" $100,000 in profit before receiving his share.  (*See* Pl.'s Opp'n 21–23.)  Under New York law, such lost profits constitute special damages.  *See, e.g.*, *Chamilia*, 2007 WL 2781246, at *15 ("Under New York law, 'special damages' are defined 'as the loss of something having economic or pecuniary value such as loss of profits,' as opposed to other types of harm to reputation or community standing.").  Because Plaintiff did not plead the lost profits with particularity, he is precluded from recovering them.

**ii.  Plaintiff's recovery for defamation *per se* damages is presumed and not limited to nominal damages at this stage of the litigation**

Because the Court finds that a reasonable jury could conclude that the email was defamatory by disparaging Plaintiff in his trade, business, or profession, general damages are presumed.  The Court declines to limit Plaintiff's potential recovery to nominal damages at summary judgment.  *See Gallo v. Montauk Video, Inc.*, 684 N.Y.S.2d 817, 818 (App. Div. 1998) (stating that for libel *per se*, presumption of actual damage to reputation arises from the statement itself which entitles plaintiff to recover general damages); *Sachs v. Matano*, 22 N.Y.S.3d 310, 312–13 (Sup. Ct. 2015) (recognizing that words which have a tendency to disparage an individual, *inter alia*, with respect to his office, trade, or business are slanderous *per se*; as such, the law presumes that damages will result, so they need not be alleged or proven).

Accordingly, the Court grants Defendants' motions for summary judgment as to Plaintiff's claim for special damages but declines to limit Plaintiff's recovery to nominal damages.

**d.  Plaintiff has abandoned his GBL § 349 claim**

ASG argues that Plaintiff cannot satisfy the elements of GBL § 349, a consumer protection statute, because "the core of Plaintiff's allegations . . . is a business dispute between different players in the airline charter business" and there is no evidence suggesting that "any deceptive acts were directed towards consumers, or the public was harmed in any way, regardless of" whether Plaintiff bases his claim on the email or "isolated statements made by Sailler on the telephone to Plaintiff himself" as he contended was the basis during discovery. (ASG Mem. 15–16.)

Plaintiff did not respond to ASG's arguments, and the Court therefore deems the claim abandoned.  "Where a partial response to a motion [for summary judgment] is made — *i.e.*,

referencing some claims or defenses but not others . . . in the case of a counseled party, a court

may, when appropriate, infer from a party's partial opposition that relevant claims or defenses

that are not defended have been abandoned." *Dynamic Concepts, Inc. v. Tri-State Surgical

Supply & Equip. Ltd.*, 716 F. App'x 5, 14 (2d Cir. 2017) (alteration in original) (quoting *Jackson

v. Fed. Express*, 766 F.3d 189, 197–98 (2d Cir. 2014)); *Colbert v. Rio Tinto PLC*, 824 F. App'x.

5, 11 (2d Cir. 2020) ("[D]istrict courts frequently deem claims abandoned when counseled

plaintiffs fail to provide arguments in opposition[,]" a practice that has been "expressly approved

. . . in the context of summary judgment motions[.]"); *see Kovaco v. Rockbestos-Surprenant

Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (finding that claims were deemed abandoned

where plaintiff "fail[ed] to argue that they should survive [defendant's] motion for summary

judgment" while arguing against the motion as to his other claims); *see also Ziming Shen v. City

of New York*, 725 F. App'x 7, 17 (2d Cir. 2018) (affirming the district court's finding that the

plaintiff abandoned claims that she did not address in her opposition to summary judgment);

*Zsuffa v. Britt Realty, LLC*, No. 18-CV-5719, 2022 WL 837025, at *2 (E.D.N.Y. Mar. 21, 2022)

("A party abandons a claim in the context of a summary judgment motion when she does not

respond to arguments concerning that claim." (quoting *Bryant v. Steele*, 462 F. Supp. 3d 249,

270 (E.D.N.Y. 2020))); *Curry v. Keefe*, No. 18-CV-208, 2021 WL 1087444, at *6 (D. Vt. Mar.

22, 2021) ("Federal courts may deem a claim abandoned when a party moves for summary

judgment on one claim and the party opposing summary judgment fails to address the argument

in any way." (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003))).[21]

---

[21] Plaintiff's GBL § 349 also fails as a matter of law because he has failed to plead nor is there evidence in the record that ASG engaged in consumer-oriented conduct that falls within the statute's ambit. GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349. To assert a claim, "a plaintiff must allege that a defendant has engaged in (1)

59

Accordingly, the Court grants ASG's motion for summary judgment as to Plaintiff's GBL § 349 claim.

## III. Conclusion

For the foregoing reasons, the Court denies Defendants' motions for summary judgment as to Plaintiff's libel *per se* claim. The Court grants Defendants' motions for summary judgment as to special damages but declines to limit Plaintiff's recovery to nominal damages. The Court grants ASG's motion for summary judgment as to Plaintiff's GBL § 349 claim.

Dated: March 3, 2025
      Brooklyn, New York

SO ORDERED:

_____/s/MKB_____
MARGO K. BRODIE
United States District Judge

---

consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citing *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 944 (2012)); *see Bates v. Abbott Lab'ys*, No. 24-919, 2025 WL 65668, at *1 (2d Cir. Jan. 10, 2025) (same). GBL § 349 is "directed at wrongs against the consuming public" and is designed to "protect people from consumer frauds." *Yodice v. Touro Coll. & Univ. Sys.*, No. 21-2986, 2024 WL 3466546, at *2 (2d Cir. July 19, 2024) (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24–25 (1995)). The Court agrees with ASG that the core of Plaintiff's claim is a "business dispute between different players in the airline charter business." (ASG Mem. 16.) Plaintiff's allegations and the record before the Court do not contain any facts supporting Plaintiff's argument that Defendant engaged in deceptive acts that materially misled or wronged the consuming public.